## NOURSE *against* PRIME, WARD and SANDS.

Where a party seeks to open a settled account, by falsifying any par-
ticular *item,* he must, in his bill, state precisely the real objection ;
otherwise he cannot make it at the hearing.

To render a transaction usurious, there must be an unlawful or corrupt
*intent* confessed or proved.

The defendants, being stock and exchange brokers, in *New-York,* in
*February,* 1818, in the course of their business, entered into an
agreement with the plaintiff, who was entitled to receive of *B.,*
of *Philadelphia,* 350 shares of *United States Bank* stock, in pay-
ment of a large sum of money, and advanced the money for the
plaintiff to *B.,* who transferred the stock to them ; and they, pursu-
ant to the agreement, retained it, with 80 other shares, previously
received from the plaintiff, as collateral security, for the promissory
note of the plaintiff, payable the 10th of *January,* 1819, given for
the principal and *interest* due to the defendants, according to an
account stated and settled between the parties ; and which included
also, a *commission* of an *half per cent.,* charged by the defendants as
a compensation for transacting the business ; and the defendants
were to re-transfer the whole 430 shares to the plaintiff, on payment
of the note ; but if the note was not paid, the defendants were at
liberty to sell the stock, accounting for the surplus, if any, and
the plaintiff remaining responsible for any deficiency. The shares
of the plaintiff were not marked or identified as his particular pro-
perty, nor was any thing said or agreed upon between the parties
for that purpose ; but the shares remained in the names of the de-
fendants, and were blended with a larger mass of shares of the same
stock held by them, belonging to themselves, or in trust for others.
The note not being paid, the defendants sold the stock, on the 25th
of *January,* 1819, and the proceeds not being sufficient to pay the
note, they brought an action at law to recover the balance : *Held,*
that the charge of *commission* was fair and *bona fide,* and not usuri-
ous ; and that, as the defendants, at all times, after the date of the
note, were possessed of shares of the stock, standing in their names,
and under their absolute and rightful control, to an amount far ex-
ceeding the number of shares so received from the plaintiff, and
were ready and able, at any time, to transfer to him the 430 shares,
on payment of the notes, there was no breach of trust on their part,
nor were they bound to account to him for the stock at a *higher price*
than what it was actually sold for by them.

THE bill stated, that the defendants, being *stock and exchange brokers*, in the city of *New-York*, on the 23d of *June*, 1817, purchased for the plaintiff, and by his order, *fifty* shares of *United States Bank* stock; and in *August* following, sold for the plaintiff, by his order, thirty shares. That on the 11th of *September*, 1817, the defendants purchased for the plaintiff *sixty* shares of the same stock; and on the 12th of *December*, *three hundred and fifty* shares of the same stock were transferred to the defendants, on account of the plaintiff, by *Biddle, Wharton & Brothers*, of *Philadelphia;* making the total of 430 shares, "then in the hands of the defendants, belonging to the plaintiff." That on the 6th of *February*, 1818, the defendants rendered a general account current to the plaintiff, including the transactions above stated. That in this account, the 50 shares purchased the 23d of *June*, 1817, are debited under the date of *July* 5; and *no credit is given* to the plaintiff for the *July dividend*, which, he alleged, the defendants received. That by this account, the balance due to the defendants was 53,917 dollars and 5 cents, for which the plaintiff agreed to give his note. That on the 11th of *February*, 1818, the defendants added to the balance 282 dollars and 95 cents as for cash, though not more than 13 or 14 dollars were advanced to justify the charge; and the plaintiff gave his note for both sums, amounting to 54,200 dollars, payable the 10th of *January*, 1819, with interest at seven per cent., payable half yearly; and the defendants retained in their possession, as collateral security for the note, the 430 shares of stock, and gave to the plaintiff a receipt, as follows : " We acknowledge to hold 430 shares of the stock of the *Bank of the United States*, as collateral security for the payment of the note, (of the plaintiff,) dated the 24th of *December* last, for 54,200 dollars, payable on the 10th of *January* next, with interest at seven per cent., payable half yearly; on payment of which note and interest, we engage to re-transfer the said 430 shares to the

plaintiff, accounting with him for the dividends that shall become payable on the same ; and in case the note and interest are not duly paid, we are at liberty to make an immediate sale of the said shares, accounting with him for any surplus, and holding him responsible for any deficiency. Dated the 11th of *February,* 1818." That the defendants did obtain, or might have obtained, certificates from the proper office, identifying the shares as the proper shares of the plaintiff, and have guarded against the casualties of trade, by indorsing the name of the plaintiff on them, or putting some other distinguishing mark on the certificates, to prevent his shares from being mixed in a common fund with other shares held by the defendants. That during the year 1818, the defendants were intrusted with shares in stock, exceeding 10,000, as trustees or agents for others, and were dealing largely in the stock of the *United States Bank,* on their own account. That the stock rose in value in 1818; and the defendants, at divers times in that year, sold the 430 shares of the plaintiff, or the greater part of them, at a large advance, without the knowledge or consent of the plaintiff, and received 65,360 dollars, or other large sums, therefor, and the dividends. That the defendants, in 1818, in consequence of speculations in the said stock, for their own benefit, had not shares or certificates of such stock equal in number to those of the plaintiff, standing in their own names and being their own property. That towards the end of the year 1818, *United States Bank* stock fell; and the defendants having sold the shares of the plaintiff and others at high prices, and purchased an equal number at depressed prices, in order to realize an enormous profit, by this breach of trust, and dealing with the property of others. That if the defendants had become insolvent, they could not have replaced the 430 shares out of a common and mixed fund, which by repeated breaches of trust committed against the plaintiff and others, they had rendered inadequate to the performance of their trust ; and they

could not have replaced the shares of the plaintiff, without a similar breach of trust as to others. That by mixing the shares of the plaintiff with other shares, and not taking proper vouchers to identify them, they acted contrary to their duty as agents and trustees, and subjected the plaintiff to the risk of losing his shares by their insolvency. That the defendants ought to account for the 430 shares at the highest rate at which they might have sold any shares, to the number of 430, since the date of the note, and for the dividends while the shares were in their hands. That on the 25th of *January*, 1819, the defendants sold the 430 shares, at their then depreciated value, and sued the plaintiff at law for the difference in the amount produced by the sale, and the amount of the note : *Prayer*, that the sale of the 430 shares on the 25th of *January*, 1819, be decreed void, as against the plaintiff, and for an injunction.

The joint and several answers of the defendants stated, that on the 23d of *June*, 1817, but after the closing of the transfer books, they purchased the 50 shares of stock mentioned in the bill ; and that no dividend was payable or received thereon, the same belonging to the seller, to the 1st of *July*, and the stock was not transferred until the 5th of *July*. That early in *December*, 1817, the plaintiff told the defendants, that he was entitled to 350 shares of *United States Bank* stock, under the control of *B. W. & Brothers*, of *Philadelphia*, and stood pledged for above 44,000 dollars, and was desirous, upon the security of the shares, to obtain the aid of the defendants, &c. That the defendants agreed to do so, and said that, as they must borrow money to reimburse their advances, they might have occasion to pledge the stock ; and the plaintiff replied, that he was willing to place the shares under the absolute control of the defendants ; and that he only wanted the same number of shares secured at the expiration of the period of credit. The defendants agreed to redeem the 350 shares, and take a transfer of them ; and it was agreed that they should

charge legal interest on their advances, and the customary commission for their agency in making or procuring the advance, and for their other services in relation to the stock. That the defendants, accordingly, paid *B. W. & Co.* 44,759 dollars, and took a transfer of the 350 shares in their own names. That on the 6th of *February*, 1818, the defendants rendered their account to the plaintiff to the 29th of *December* preceding, the balance of which, exclusive of their compensation, or commission, on obtaining and paying the several sums of money, and in negotiating the business, was 53,917 dollars and 5 cents ; and the compensation having been fixed by agreement between the plaintiff and defendants, at half per cent. on the amount of payments, the defendants, to make up an even sum, charged the plaintiff with the further sum of 282 dollars and 95 cents as cash, and settled the account by paying to the plaintiff the difference (13 dollars and 37 cents) between that sum and the amount of their commissions, and taking his note for the sum of 54,200 dollars, dated *December* 24th, 1817. The defendants admitted that they dealt largely in *United States Bank* stock in 1818 ; and that it would have been practicable to have obtained a separate certificate for the 430 shares of the plaintiff, and in such special form as to identify them; and such certificate might have been indorsed with the name of the plaintiff. But they did not do this, as it is not the usual practice of brokers to take out certificates of stock, until they have occasion to use them ; and the defendants were never requested by the plaintiff to take out certificates for his shares, or to identify them; and no designation had been made of the shares held by *B. W. & Brothers ;* and the practice, in such cases, pursued by them, was known to the plaintiff. That during the greater part of the year 1818, and at the date of their receipt, the defendants held, and had the absolute control of a large number of shares; partly on their own account, and partly in trust for others. That the

1823.

NOURSE
v.
PRIME.

stock intrusted to the defendants, was for the purpose of selling, pledging, &c.; and the disposition made of it was authorized by the owners; and they denied all breach of trust, or any incapacity, at any time, to perform the trusts committed to them. That there was no time during 1818, at which they were not possessed of shares standing in their own names, and at their absolute control, to an amount far exceeding 430 in number; nor a moment at which they would not have been willing and ready to transfer the 430 shares to the plaintiff, on payment of his note; and they denied that there was any period in that year, in which they had not shares or certificates of stock in their possession and name, and under their rightful control, to an amount far exceeding 430 shares, over and above those, which standing in their names, may have been the property of others, &c. They admitted, that they did not always, during the year 1818, hold, in their own names, as many shares as had been intrusted to them; and that those which they did hold, were, in no instance, designated by any mark. That the whole 1930 shares, referred to in the plaintiff's amended bill, were not their own property, but they had full right to sell them; and there was no time at which they had not, at their rightful control, more shares than were sufficient to meet all demands which could, lawfully, be made upon them, for the transfer and delivery of shares in the said bank. They allege, that they were fully authorized to pledge, sell, or dispose of, the shares of the plaintiff, as their business might require, to sustain their advances, under their responsibility to replace the shares at the expiration of the credit given to the plaintiff; but they denied that they ever did so pledge or sell any part of the plaintiff's shares. They admit that they sold the 430 shares of the plaintiff, in *January*, 1819, and brought a suit at law against him for the balance; but they denied that they purchased any shares, to sell them as those of the plaintiff,

Testimony having been taken in the cause, it was brought to a hearing on the pleadings and proofs.

*T. A. Emmet,* for the plaintiff.

*Wells,* for the defendants.

THE CHANCELLOR. The prayer of the bill is confined to two specific objects of relief, and no other general or particular relief is asked. The objects were, to set aside the sale by the defendants, of the 430 shares, and to grant an injunction staying the suit at law.

But the bill specifies two errors, or mistakes, in the general account current, rendered by the defendants to the plaintiff on the 6th of *February,* 1818, and which account was settled, and admitted by the plaintiff to be correct, when he gave the note for the balance therein stated. The one *item* is, that 50 shares of *United States Bank* stock, purchased on the 23d of *June,* 1817, were debited under the date of the 5th of *July* following, and that no credit was given for the dividend declared payable on the 4th of *July,* and which the bill charges to have been received by the defendants. The answer denies the truth of the charge that any such dividend was received, and gives a satisfactory explanation of the transaction. It states, that on the 23d of *June,* 1817, (*but after the closing of the transfer books,*) the defendants purchased the 50 shares, and they deny that any dividend for *July* was payable to the purchaser; and they aver, that the stock was actually transferred on the 5th of *July,* and was not transferable before; and that the seller was entitled to the dividend, as being the person in whose name the stock stood when the books were closed. This denial of any mistake, or error in the *item* in question, is conclusive in the absence of all proof in support of the allegation in the bill, and more especially, when it relates to a stated account which

the plaintiff seeks to falsify, and which he had admitted when the transaction was recent and fresh in the memory, and in the observation of the parties.

The other objection raised in the bill to the account rendered, is, that on the 18th of *February*, when the agreement of the 6th of *February* was about to be carried into effect, the defendants added to the balance there struck, the sum of 282 dollars and 95 cents as for cash, though not more than thirteen or fourteen dollars in cash were advanced. The defendants, in their answer, state, that in that sum they included their commission, or a compensation of one half per cent. on the amount of their payments, (and which commission amounted to 269 dollars and 58 cents,) and paid the residue in cash, in order to make the even sum of 54,200 dollars ; that residue must have been 13 dollars and 37 cents. This commission was charged as a customary commission for the agency of the defendants in making or procuring the advance, and for their other services in relation to the stock, and in negotiating the arrangements mentioned in the bill. In their account current, rendered on the 6th of *February*, the defendants charged a commission on the purchase of the 50 and the 60 shares of stock for the plaintiff, and on the sale of the 30 shares. This commission amounted, as charged, to 43 dollars and 43 cents ; but there was nothing charged for the negotiation with Messrs. *Biddle, Wharton & Co.* of *Philadelphia*, in procuring the transfer of the 350 shares, which stood pledged to them for upwards of 44,000 dollars. The defendants were entitled to a reasonable compensation for that negotiation; and there is no colour for the suggestion of the counsel for the plaintiff, that this charge was usurious, and intended as a colourable evasion of the statute of usury. The plaintiff made no such charge on the bill ; he must have known the ground of the charge in the account ; and the explanation which was given of it at the time the account current was rendered and admitted,

must have been received as satisfactory. He only says
in the bill, that though the sum of 282 dollars and 95 cents
was set down *as cash*, there was very little cash advanced
to justify the charge; but he does not pretend to say it
was an unjust, oppressive, unlawful, or usurious charge.
When a party seeks to open a settled account, by falsifying
any particular *item*, he is bound to state the real ob-
jection, if any there be; and it is not sufficient for his
counsel, upon the hearing, to supply the omission: the
cause is to be decided upon the allegations in the plead-
ings and upon the proofs. The plaintiff has afforded us
no proof in relation to the charge; and he rests contented
with the explanation given in the answer. Whether money
was demanded or received usuriously, is a matter of fact,
and rests upon the intent, and that intent ought at least to
be charged, and confessed or proved. The Court ought not
to undertake, gratuitously, to deduce such intention, when
the case is susceptible of another and better construction.

The commission was for the agency of the defendants in
the negotiation relative to the stock, and the rate of it was
fixed by agreement between the parties. If one man re-
quires another to go into the market to buy goods, or pro-
duce, or stock for him, and he does it, and advances the
money, he is certainly entitled to a compensation for his
services in making the purchase, besides the repayment
of his money, with interest, from the time it was advanced.
In this case, the negotiation extended to another state, by
direction of the plaintiff; and whether the commission for
procuring the stock from *Philadelphia* was high or low,
was a question for the parties to settle by their agreement.
It is very evident, that nothing like usury for the future
loan, or upon advance of the money, was in contempla-
tion; and there must be the unlawful or corrupt *intent*
confessed or proved, before we can pronounce a transaction
to be usurious.

. In the case *Ex parte Henson*, (1 *Maddock's Ch. Rep.* 112.)

To constitute
usury, there
must be an un-
lawful or cor-
rupt *intent*.

A *bona fide* charge by a banker or broker, of a commission, or extra sum, for expense and trouble, &c. is not usurious.

a bill-broker, in the country, received, in part payment of money loaned, a bill of exchange on *London*, and he charged a commission of ten *per cent.* for transmitting the bill to his agent in *London*, to receive the money due thereon when at maturity. His banker in *London* charged him only five per cent. It was contended that this security, taken for forbearance of a debt at more than five per cent. was usurious. But the Vice-Chancellor observed, that many cases had decided, that if a sum, claimed for commission, was *bona fide* claimed, and not done colourably with a view to avoid the statute, it was not usurious. If the commission be usual, and not unreasonable, it is not usurious. In that case, there was no loan of money, nor any thing done colourably, and as a veil for usury. In the case of *Dunham* v. *Gould*, decided in the Court of Errors, (16 *Johns. Rep.* 367.) the jury found the fact, that the exchange of notes between the parties " was for the purpose of raising money at a greater rate of interest than seven per cent. *per annum.*" And, in delivering the opinion of the Court in that case, I observed, that it was a case distinct in principle from that class of cases in which the allowance of a reasonable sum beyond interest to country bankers, for re-exchange and remittance of the money from a distance, and the allowance of a reasonable sum for incidental expenses, or *extra* trouble, in the particular case, and when there was no colour for usury, had been exempted from the operation of the charge and the consequences of usury. I referred to the case *Ex parte Jones*, (17 *Ves.* 332.) as one of the class of excepted cases; there a country banker, who had, in the usual course of his business, discounted bills for a *London* merchant, charged a commission at the rate of 2s. 6d. *per cent.* per month, for the time the bills had to run, besides the lawful interest. It was held by Lord *Eldon* to be a lawful and reasonable commission, as the country banker had to provide funds in *London* to meet the bills, and there was

no colour or device in the case to evade the statute. The case of *Hammett* v *Yea*, (1 *Bos. & Pull.* 144.) was also referred to by me in that case, as forming another exception. The country banker took more than lawful interest; but the small surplus was referred to the expense of remitting part of the loan in bills on *London*. If the party, says Ch. *J Eyre*, intentionally takes more than lawful interest, for the forbearance of a loan, it is usury ; " but whether more than lawful interest is intentionally taken upon any contract for such forbearance, is a *mere question of fact* for the consideration of the jury, and must always be collected from the whole of the transaction as it passes between the parties." " A banker is entitled to a recompense for the accommodation he affords to his customer, in remitting to *London*, by bills of thirty days. It is a fair measure of recompense, supposing there is no device in the transaction; and that the remittance is not intended to be used as a colour for putting more money into the banker's pockets, for the mere forbearance of a loan, than is allowed by law." Where money is advanced under particular circumstances, a man (says *Rook*, J. in that same case) may be warranted in taking more than five *per cent.*, if the surplus be taken for additional expense, risk, and trouble.

The defendants, in the case before us, had, under the directions of the plaintiff, taken up *United States Bank* stock, that stood pledged to a mercantile house in *Philadelphia*, and procured the transfer and transmission of it to them at *New-York*, and they had to provide funds at *Philadelphia* for that purpose, and the *extra* charge may be considered as a reasonable compensation for this *extra* expense, risk, and trouble. If the commission stands charged upon the whole balance of 53,917 dollars and 5 cents, instead of the 44,000 dollars, a sufficient explanation may be presumed to have been given at the time; and we may adopt the words of Ch. J. *Eyre*, in one of the cases cited, that it is a question of fact, under all the cir-

cumstances, (and which at law is for a jury,) whether the overplus " be not properly referable to some lawful collateral consideration?" There may be a few dollars in that *item* beyond the rate of one half *per cent.* on the *Philadelphia* negotiation ; but there is no ground to conclude it was intended to be usurious. This would be utterly absurd, when we consider the nature and magnitude of the transactions. And as the plaintiff has not so much as hinted that the charge was unlawful or usurious, and as the defendants have referred it to the head of a customary commission for their agency, it would be equally unjust and unwarrantable, to stain the account with the imputation of usury. I am persuaded that an usurious intention never existed in the case ; and that the suggestion is entirely without foundation in point of fact.

The great object of the bill is to set aside the sale of 430 shares by the defendants, in *January*, 1819, by having the same declared void. This is the prayer of it ; but the points presented in writing at the hearing, by the counsel for the plaintiff, have a more correct and intelligible object. They do not state any objection to any *items* in the account current, for the balance of which the note was taken. They confine the claim to an account to be rendered of the 430 shares at the highest market price of *United States Bank* shares, during the year 1818, with interest; and that the sale of that number of shares by the defendants, in *January*, 1819, shall not be deemed to affect the rights of the plaintiff. The claim assumes, that the defendants sold the shares of the plaintiff during the year 1818; and the answer denies the charge, and avers that the shares of the plaintiff, deposited with them as collateral security for the note, were not sold until *January*, 1819, when they were authorized to sell them upon default of payment of the note.

The plaintiff, on the 11th of *February*, 1818, owned 430 shares of *United States Bank* stock, in the possession of the

defendants, and which stood in the name of the defendants, without any certificates or other marks, designating them as the property of the plaintiff. This fact is to be inferred from the manner in which the shares came to the possession of the defendants, and from the language of the pleadings, and from the absence of all proof in opposition to this inference. They purchased 50 shares for the plaintiff in *June*, and sold 30 of them in *August*, 1817. It is to be presumed the whole 50 stood in their names; for nothing is said of any power of attorney, by which a portion of them was sold. The facility of negotiation would probably have dictated such a course; and the confidence which appears to have been reposed in the defendants, warranted it. In *September*, 1817, they purchased 60 shares for the plaintiff; and in *December*, 350 shares were actually transferred to them, for and on account of the plaintiff. These 350 shares stood in the names of *Biddle, Wharton & Co.* without any declaration of trust, designating them as the property of the plaintiff; for no power was given to *Biddle, Wharton & Co.* to transfer them to the defendants. The evidence is also to this effect. They were undistinguished and mixed together by *B., W. & Co.* with their own stock; and with knowledge of this, the plaintiff directed that they should be transferred, and they were transferred, in the same condition, to the defendants. These are irresistible conclusions of fact to be drawn from the case. When the note was given by the plaintiff, the defendants *retained in their possession*, (to use the language of the bill,) as collateral security, the before mentioned bank shares, and they gave a receipt to that effect to the plaintiff; and this is all the evidence we have, distinct from the pleadings, of the terms upon which the shares were to be retained.

By the receipt, the defendants acknowledge " to hold 430 shares of stock in the *Bank of the United States*, as collateral security for the payment of the note; on pay-

1823.

NOURSE
v.
PRIME.

ment of which, they engage to re-transfer the said 430 shares to the plaintiff," &c. The receipt does not refer to any specific shares designated as belonging to the plaintiff; they only hold 430 *shares of United States Bank* stock, which the receipt assumes to stand in their names, because, upon payment of the note, they are to *re-transfer* them to the plaintiff; and when they engaged to re-transfer the *said* 430 shares, that part of the receipt referred to the former part of it, and could not mean to mark as particular, what, in the antecedent, was general in description; nor could the *said* 430 *shares* mean any thing more than 430 *shares*. It meant that the given number of shares should be transferred, and it meant nothing more; for there was nothing specific, but the number, and the quality of the stock. There was nothing else to which it could apply.

Here, then, we have the plain case of a plaintiff consenting that the defendants should *retain* 430 bank shares, which they then held in their own names for him, until the happening of a certain event; and yet the plaintiff complains that the defendants did not procure certificates for them from the proper bank office in the name of the plaintiff; or, by some other way, mark, designate, and identify 430 shares, so that they should appear upon the face of them to belong to the plaintiff, and to be held by the defendants in trust merely. The obvious answer to that complaint of the plaintiff is, " why did you not identify them yourself, before you consented to this deposit? You knew that they stood in the names of the defendants, and you acquiesced in it; and the presumption is, that you intended that they should *continue* to be so held, as nothing was done by you to designate them, or separate them from the mass of other shares of like stock in the possession of the defendants; and, as no instructions were given to them on the subject, they were to retain." They were *to hold* 430 shares, as collateral security for the note; and they re-

tained and held 430 shares for that purpose during the whole year, 1819; and this was all they were required to do by their contract. It was the business of the plaintiff, and not of the defendants, to designate his own property, and to give it such description and character as he thought proper. If the plaintiff was apprehensive of the casualties of trade, and wished to have his shares separated from the common fund with other shares held by the defendants, he should have directed or requested that act to be done. The defendants were not bound, without his direction or desire, to change the situation or condition in which the shares were, when the contract was made; and which situation was known to the plaintiff.

I am perfectly satisfied, from the history and nature of the transaction, that the parties *intended* that the 430 shares should continue to stand in the name of the defendants. This was the usual course with brokers in like cases, and stock was generally left standing to their credit on the transfer books, without taking out certificates. It was the most convenient way to render stock pledged as a collateral security, an efficient security under the authority to sell. If the stock had stood in the plaintiff's name, a power of attorney to transfer, in case of default, would have been requisite; and none is mentioned as having existed in this case.

It is contended, on the part of the defendants, that, considering the manner in which the stock in this case was acquired and held, as well by *B.*, *W. & Co.* as by the defendants; and considering the established usage and practice of brokers in similar cases, and the general and known course and extent of business of the defendants, as dealers in stock, there was an implied authority from the plaintiff to the defendants to sell or pledge the stock to raise money to meet their advances in respect to this very plaintiff; and that the plaintiff only reserved to himself a right to call for a re-transfer to him of a similiar number

1823.

NOURSE
v.
PRIME.

of shares on payment of his note. I think the facts in the case well warrant this inference; and the assent of the plaintiff to leave the stock with the defendants, without designation or direction, is pretty conclusive evidence that such a trust and confidence was within his contemplation. It is proved by the witnesses, that the defendants carried on very extensive operations as stock-brokers; and that it was their practice, and one well known to those who dealt with them, to use the stock deposited with them, for the purpose of raising money for advances upon it. This was understood to be within the general and implied powers of the defendants, and other dealers in stock, in cases where there was no express prohibition to the contrary; and the stock held by them in their own names, or with blank powers of attorney, for and on account of others, they could hypothecate or sell, under the same implied power, to sustain their advances. There was nothing unreasonable in this; for it was founded on mutual consent and understanding, and was beneficial to the owner, by enabling him to borrow, with facility, money upon the stock; and beneficial to the broker, by enabling him to supply the wants of his customer. It was in the power of the owner of the stock to prohibit the exercise of such a power, and to have the stock identified and placed in his name, if he deemed that course the most eligible; and it was equally in the power of the broker to refuse the loan on those restricted terms of deposit. It was an affair of mutual concert and arrangement; and no one had any right or cause to complain of it. The only question here is, was not this arrangement and authority fairly to be inferred from the transactions in this case, when taken in connexion with the known usage and practice in this particular business? I think so; and that there is not any sufficient ground upon which to raise a doubt, as to the correctness of this conclusion. I cannot, and do not believe, that this arrangement with the plaintiff was intended

as a mere loan of 54,200 dollars for a year; and that the stock was intended to be withdrawn from circulation, and to be locked up, and to be idle during that period, without any power in the defendants to apply it to the exigencies of their business, arising, in part, from these large advances for the use of the plaintiff. The good sense and obvious policy of the transaction, speak a different language. There was perfect reliance placed by the plaintiff in the ability and integrity of the defendants to replace the stock when the note was paid; and there is nothing in the words of the receipt that is inconsistent with this construction of the contract. To hold a given number of shares without note, certificate, or mark, to distinguish them from a large, undefined, and constantly varying mass of shares belonging to the defendants, or under their entire control, evidently implies that they were to be used like the other parts of the fund; and that all that ought to be required, or was intended to be required, in this case, was a readiness and ability to replace the stock when duly called for.

But it is unnecessary to press this point any further, for the defendants, in their answer, deny that they did sell or pledge any part of the 430 shares belonging to the plaintiff, until he had failed to pay his note. They admit, however, that all the shares so transferred to them, were indiscriminately placed in their hands, and constituted one common mass, or fund, subject to their control, and from which they were authorized to make, and did make, such transfers and appropriations as the exigencies of themselves and others required. They aver, "that there was no time during the year 1818, at which they were not possessed of shares standing in their own names, at their absolute and uncontrolled disposition, to an amount far exceeding 430 shares in number; nor any moment in which they would not have been ready, willing, and able to have transferred the said shares to the plaintiff, upon payment of the note."

1823.

NOURSE
v.
PRIME.

They deny every allegation in the bill to the contrary; and they further aver, that during the period of the note, from its date to the default, "they had always held, and considered themselves as holding, a much greater number of shares, (than those belonging to the plaintiff,) ready to be transferred to the plaintiff, whenever he should entitle himself to require such a transfer." They deny that "there was any period, during the year 1818, at which they had not shares or certificates for such stock in their possession, in their own names, and under their rightful control, to an amount exceeding 430 shares, over and above those which, though standing in their names, may have been the property of other persons." They also aver, "that there was no time at which they had not at their rightful command and control, more shares than were sufficient to meet all the demands, which any person or persons could lawfully make on them, for the transfer and delivery of shares." They further aver, "that 1930 shares was the lawful number of shares of such stock which, since the 11th of *February*, 1818, they had in their possession, standing in their own names, and under their absolute control, and for the sale of which no bargain was made by any person with them; yet they admit the whole of them were not absolutely their own property, but they had good right and lawful authority to sell and dispose of them as they might have thought proper." The defendants deny "that they, at any time, committed any breach of trust towards any of the owners of shares in their possession, by any unauthorized disposition of the same; or that the general mass or fund of shares under their control was, by any breach of trust or otherwise, rendered inadequate to the performance of the trusts committed to them by the owners; or, that they were, by any means, incapacitated to replace the shares of the plaintiff, without committing any injury, or breach of trust, towards some other person."

Every allegation in the bill, material to the claim of the

plaintiff, is thus fully and explicitly denied in the answer;
and the proof which has been produced, tends to corroborate,
and there is none to contradict it.   The lowest number of
shares standing in their names, at one time, was 1074, and by
means of powers, not less than 1930.   I am aware that the
answer has been subjected to minute and severe criti-
cism, by the learned counsel for the plaintiff; but as I read
it and understand it, the answer is sufficiently precise and
explicit.   We are to give to the language of it the plain
and ordinary interpretation ; and I should apprehend, that
if I were to weigh every word and sentence in an answer,
with piercing and critical jealousy, I should be dealing
with it "too curiously," and, perhaps, with great injustice.

What more could the plaintiff require, under the circum-
stances of this case ; and what injury has he sustained ?
If the shares had been identified, and certificates taken for
them in the name of the plaintiff, and the trust explicitly
declared on the face of them, they would have remained
unsold, until the time they were actually sold, under the
contract.   It is not to be supposed, the defendants would
have undertaken to sell shares marked with the name of
another owner, and under the difficulty and delay of pro-
curing the requisite powers, duly verified, so long as they
had other shares, standing in their own names.   It was
sufficient, in this case, under the contract between the
parties, that the defendants had always an adequate num-
ber of shares on hand to satisfy the plaintiff, during the
period of his note, and according to the terms of their en-
gagement ; and that they were always under a legal and
moral, as well as actual capacity, in point of fact, to trans-
fer the 430 shares to the plaintiff, upon due demand.   I
have seen no reason to doubt of the construction which I
gave to the contract, and of the equity and justice of the
doctrine which was applied to the case, when the cause
was formerly before the Court, on a motion to dissolve the
injunction.   (4 *Johns. Ch. Rep.* 490.)   There is no kind

of analogy between this case and the tortious mixture of another's property with one's own, so that a separation cannot be made. The shares of the plaintiff and of the defendants were mixed together by common consent; there was no doubt in the case; and the plaintiff agreed that his shares should remain in that situation; and all that justice could require, is, that the defendants should be answerable for the given number of shares, when the plaintiff entitled himself to demand them. Nor have the cases of *Bostock* v. *Blakeney*, and *Forrest* v. *Elwes*, (2 *Bro.* 653. 4 *Ves.* 492.) referred to by the plaintiff's counsel, any application; for these cases and the general rule, so fully admitted in *Devaynes* v. *Noble*, (1 *Merivale*, 580, 581.) suppose *a breach of trust*, in the trustee selling stock, contrary to his duty. But here, the breach of trust is denied, and there is no proof of it. On the contrary, the case shows, that the defendants always retained on hand as many as 430 shares, and which the defendants had a right to say, and which the law will say for them, *were the shares deposited by the plaintiff*.

The case of *Le Croy* v. *Eastman*, (10 *Mod. Rep.* 499.) contains principles much more pertinent. *Neve*, the defendant, held 990 pounds in *South Sea* stock, in trust for the plaintiff. The stock stood in his name, and he gave a note, declaring the trust. Five hundred pounds of it was afterwards transferred to the plaintiff, and a bill was filed for an account of the residue, at the then price of stock. The defendant admitted, in his answer, that he had mortgaged 1000 pounds of stock, and had sold out all the stock in his own name, except 80 pounds; but he had more than enough, in another person's name, to have answered the trust, if the plaintiff had insisted upon a transfer; and he offered the residue of stock due to plaintiff, to 490 pounds, with the dividends. Lord Chancellor *Parker* held, that the defendant was accountable only for the stock and dividends, and not for the price at which the stock was held. He ob-

served, that, as 100 pounds *South Sea* stock was not to be "specificated" from another, equity will never adjudge a man to have broken his trust in a higher degree, when he may, with equal reason, be adjudged to have broken it in a lower; and that the stock *mortgaged* must be esteemed the stock of the plaintiff, and the stock *sold* that of the defendant.

To apply the doctrine of Lord *Parker* to this case, as there was no criterion agreed on by the parties, or declared by the plaintiff, by which 430 shares of *United States Bank* stock, were to be distinguished from other 430 shares, the 430 shares remaining with the defendants during the year 1818, must be esteemed the shares of the plaintiff, and the shares sold, those of the defendants. The conclusion is just as natural, proper and reasonable, in this case, as in the other; and in this respect, the decision of Lord *Parker* is an authority directly bearing on the case.

I shall, accordingly, declare, that there is no just ground for the charge, or suggestion, made on the part of the plaintiff, that the defendants had received, or ought to have received, or were accountable for, the *July* dividend, on the 50 shares mentioned in the pleadings, and debited under the date of the 5th of *July*, in the general account current, therein also referred to; or, that the charge of 282 dollars and 95 cents, in the said account, of the date of the 11th of *February*, 1817, was usurious, unlawful, or unjust. And I shall further declare, that the defendants are not guilty of any breach of trust, as charged in the bill; and that 430 shares of *United States Bank* stock, belonging to the plaintiff, and held by the defendants as collateral security, according to the terms of the contract of the 11th of *February*, 1818, between them and the plaintiff, and stated in the pleadings, continued to be held by them, according to the said contract, until the sale thereof, in *January*

1819, under a provision of the said contract. The bill is, accordingly, to be dismissed, with costs.

Decree accordingly.