ALPHEUS SWAYZE

v.

JOANNA SWAYZE, executrix of Jacob L. Swayze, deceased.

1. After an injunction bill had been filed to restrain proceedings at law on a note given by complainant to defendant's testator, an account, compromise and release of all matters between the parties was effected. Subsequently, a supplemental bill was filed, which alleged that the settlement and release had been obtained from complainant during his mental incapacity to transact business, and to this an answer and plea were filed, setting up the account stated and release.—*Held*, that the burden of proving his incapacity lay on the complainant.

2. Where the matters of account were equally within the knowledge of both parties, and there was no surprise, but considerable deliberation, and complainant allowed the settlement to stand for five years unquestioned, the court will not disturb it, although one party thereto was the agent of the other.

On bill and supplemental bill to set aside a release, and for an account.

*Messrs. J. G. Shipman & Son*, for complainant.

*Mr. A. G. Richey* (with whom was *Mr. Francis J. Swayze*), for defendant.

BIRD, V. C.

For many years prior to the year 1871, the complainant had resided in Trenton, and was largely engaged as a dealer in real

estate and in personal securities. In the year 1871, he was the owner of a large amount of real estate. In the summer of that year his health became impaired, and at length his mind was seriously affected. He was quite incapable of transacting business. His wife then requested a brother of the complainant, who was living and doing business at Newton, to take charge of the business of complainant. The complainant executed to his brother a power of attorney, " creating him," as he says in this bill, " attorney in fact, to dispose of and manage all your [his] orator's business in such way as he might think proper." This paper bears date December 16th, 1871. In about two months thereafter the complainant was taken to an insane asylum in Philadelphia, where he remained for about three months. On December 15th, 1871, he and his wife executed a deed of conveyance, including all his real estate, to Jacob L. Swayze, and delivered it to him. Thus, by virtue of the power of attorney and the said deed, Jacob L. had the absolute possession and control of all the real and personal estate of his brother. Able and experienced counsel were advised with. This course was taken in the interest of complainant The immediate cause of this transfer was perhaps not so much the mental prostration of complainant as his great financial embarrassment. Creditors would not be delayed. The large means of complainant should be utilized. To do this, while complainant was in such distress, a third person was called in. Jacob L., the brother, undertook this task. He became not only an attorney in fact, but trustee for complainant and his creditors. The creditors had a right to demand of him a faithful administration of his trust until they were paid, and complainant had a right to all the balance, less costs and reasonable commissions.

On February 15th, 1872, complainant was taken to the asylum, and remained there until June 10th of the same year, when he returned to his home and family in Trenton. In his bill he says, " in a short space of time he was restored to perfect health and strength, both of mind and body." This allegation deserves attention in the consideration of this cause. It was made more

than two years before the bill was filed, which, being an injunction bill was sworn to by complainant. His then restored condition becomes quite significant in view of the next allegation, which is, that soon after he returned home, " he spoke to his brother, Jacob L. Swayze, about his business, but his said brother did not give him any satisfaction, but continued to manage your orator's estate the same as he had done while your orator was of infirm mind and body, and to treat it as if it was his own estate." At the very outset, then, Jacob, the trustee, assumed a hostile attitude. The complainant also says that he frequently urged his brother to a settlement but that he was always refused. This makes it plain that as soon as the complainant was restored to his right mind, notwithstanding Jacob was trustee and must account as such, the confidence which the law presumes to exist was severed, and they stood towards each other as strangers. It cannot be that, after these occurrences, Alpheus any longer leaned upon or confided in his brother. And the evidence fully corroborates this. These observations ought not to be overlooked in considering the case made by the supplemental bill.

The estate of complainant which had not been used in the payment of his debts, remained in the hands of Jacob. The disposition of this balance aggravated the differences between these brothers and precipitated this litigation.

In the year 1874, the complainant opened a store in Newark, and attempted business on his own account. During that year these brothers had a serious dispute respecting the property of Alpheus and the management of it by Jacob, and they separated in great anger. Jacob immediately brought suit against Alpheus on a note for $2,000, given by Alpheus to Jacob in November, 1871. Alpheus filed a plea to the declaration in that action, and then presented his bill in this court and obtained an injunction restraining the further prosecution of that action at law. That an opportunity might be had for a settlement, counsel for complainant extended the time for filing answer. Jacob promised the counsel of Alpheus that he would furnish to him a statement showing how the accounts stood. After weeks of delay, I

think such statement was furnished, but it has not been produced, nor is it known what it contained.

After the commencement of these legal proceedings I infer, from complainant's testimony, that he and Jacob had a meeting in Newark, and at Dover, and at Hope, with a view of settling their differences. The one at Hope was at the house of an uncle, who says the effort continued through portions of two days. This was in June, 1877, more than a year after complainant had opened a store at that place, and had been carrying on business on a large scale. On the 19th of August of that year (1877) he went to Newton to visit his brother Jacob. He met there his wife and children, his sister, Mrs. Apgar, and his father. He remained over until the 22d. While at Jacob's, at this time, a settlement was effected. The complainant says he does not think that he and Jacob were engaged in the effort to settle over two hours. The result of their interview was reduced to writing. All of that instrument, except the statement of the account, is a follows, viz. :

"Agreement this 21st day of August, 1877, between Alpheus Swayze, of Hope, in the county of Warren, and state of New Jersey, and Jacob L. Swayze, of Newton, in the county of Sussex, and state of New Jersey, witnesseth, that the said parties have this day made a settlement of all matters and things arising out of the undertaking and trust wherein the said Jacob Swayze took charge of the business of the said Alpheus Swayze, and sold his property and paid his debts, by virtue of a certain agreement between the parties hereto, and a certain power of attorney, executed by the said Alpheus Swayze to the said Jacob L. Swayze, both bearing date December 16th, 1871, and that they find due to the said Jacob L. Swayze from the said Alpheus Swayze, the sum of $3,207.22, in the foregoing and attached statement of accounts; and the said Alpheus Swayze, for and in consideration of the premises mentioned aforesaid and connected with the trust, doth hereby covenant, promise and agree to pay to the said Jacob L. Swayze the said sum of $3,207.22, with interest from the 1st day of September, 1877, and to secure the payment of the said sum of money, doth hereby ratify and confirm the assignment of two certain policies of life insurance in the Mutual Life Insurance Company of New York, the one on the life of himself and the other on the life of his father, Israel Swayze."

It was executed in duplicate. One copy was taken by complainant. The father of Jacob and Alpheus, their wives and

sister, Mrs. Apgar, the subscribing witness, were all present at
the execution. The next morning, Alpheus went to the bank in
Newton, of which his brother was president, expressed satisfaction with the settlement to the cashier, procured a loan of money
on a note endorsed by Jacob and returned to his home and place
of business at Hope. Alpheus says he placed this paper in his
safe and did not see it until after Jacob's death. He also says
that he told his counsel of the settlement and how he had settled,
the latter part of the year 1877, and that his counsel then disapproved of what he had done.. After this he obtained other
accommodations at the same bank above named. In the spring
of the year 1881 Jacob was taken very sick; Alpheus heard of
it, and there was some correspondence between Alpheus and
Frank J., a son of Jacob. Alpheus mentioned a note for
$3,200 which he had endorsed, and asked the son to inquire of
his father respecting the nature of his liability thereon, so that in
case of Jacob's death there would be no misunderstanding about
it. The son inquired and the result was satisfactory. It does
not appear that the subject of this litigation was ever referred to
by either Jacob or Alpheus in the presence of the other after the
execution of the above-named instrument, although they visited
or otherwise met frequently. Nor was it brought to the attention
of Mrs. Swayze, executrix of Jacob, until the period of time
allowed by law under the rule to bar creditors, had about expired. Then Alpheus filed a claim with the executrix for $137,-
876.79, after giving the estate credit with the sum of $248,442.30.
Notice was given that this claim was disputed. Before the expiration of three months a supplemental bill was filed by
Alpheus, in which the allegations in the original bill filed in 1874
were substantially repeated; after which it is stated that the
friends of both parties desired a settlement and compromise;
that the suits were suspended and negotiations for settlement
begun; that Jacob was arbitrary and insisted on dictating the
settlement, and that complainant should dismiss his counsel;
that the complainant has never been of perfectly sound body or
mind, and not so capable of transacting business as before the loss
of his mind; that in the year 1876 he had a severe attack of sick

ness, and upon his partial recovery Jacob came and urged him to come to his house for a settlement; that Jacob came on another occasion for a settlement; that the wife of complainant, because of the effect of the situation on his mind and body, urged him to try and settle with his brother' upon some terms; that he went to Newton, and that there Jacob told him how he would settle, and that he would not settle in any other way, and that complainant could do that or nothing; that Jacob produced an agreement which he wished complainant to sign, and sets forth the agreement above copied. The supplemental bill further states that said paper was executed at the private office of Jacob, and that complainant was so nervous and excited when he heard the paper read that he was completely unmanned, and was so much in fear of Jacob, and his mind and body both in such an unsettled and helpless state, that he was incapable of offering any resistance to said Jacob, and tacitly assented to all his desires, and simply in a mechanical way signed the said instrument; that very soon after he signed, he left the house of Jacob; that after he got home and had time and opportunity to recover from his great excitement of mind and body he remembered his act in signing the paper, and felt he had done a most unwise and foolish act, and had signed a paper acknowledging an indebtedness against himself, while he knew, when rational, that that paper did not express the true settlement, and that said Jacob owed complainant as he had set forth in his original bill; that he spoke to his wife about it and she urged him to let it alone; and that he spoke to counsel about it, who told him that he had done wrong to undertake to settle without his counsel and that he had been greatly wronged.

The supplemental bill declares the said writing to be void, and prays that it may be so decreed.

It will be perceived, therefore, that the complainant sets up this agreement and settlement for the purpose of attacking and overthrowing them. Until removed they are insurmountable barriers.

The defendant, by her plea, presents this agreement and the account, item after item, of debt and credit, covering over twenty

pages of her plea, which is supported by an answer. The plea avers that after an examination of said account item by item by the said complainant, he signed said writing, and urges that said settlement and agreement are a bar to this suit.

The complainant now insists that the nature of the pleadings— the defendant setting up the release which is admitted in the bill —imposes the burden on the defendant, and that consequently the defendant must not only establish the release, the execution of which is formally admitted in the bill, but every item of it. In support of the view that the burden is on the defendant, counsel cite *1 Dan. Ch. Pr. & Pl. 604, 631.* It is insisted that by filing the plea, the cause of action is admitted, but that the subject-matter of the plea operates as a bar, and that this obliges the defendant to maintain his plea, citing *1 Dan. Ch. Pr. & Pl. 662, 718; Flagg* v. *Bonnel, 2 Stock. 82; 1 Barb. Ch. Prac. 119–124; Stout* v. *Seabrook, 3 Stew. Eq. 187; Rev. p. 109 § 29; McEwen* v. *Broadhead, 3 Stock. 129; Dows* v. *Mc-Michael, 6 Paige 139; Fish* v. *Miller, 5 Paige 26; State of Rhode Island* v. *Massachusetts, 14 Peters 210; Daniels* v. *Taggart, 1 Gill & J. 311; Hughes* v. *Blake, 6 Wheat. 453; Davison's Exr.* v. *Johnson, 1 C. E. Gr. 112; McClane's Admrs.* v. *Shepherd's Exrx., 6 C. E. Gr. 76; Bogardus* v. *Trinity Church, 4 Paige 178.*

The principle that the burden is on defendant, thus contended for, is without exception, I believe, in case of pleas purely affirmative. It is not true, however, in case of pleas styled negative. The latter are in some respects founded on allegations in the bill. *1 Dan. Ch. Pl. & Pr. (4th ed.) 604.* They are sometimes called anomalous pleas, which consist mainly of denials of substantial matters set forth in the bill. *Story's Eq. Pl. § 651.* The plea in the case before us is of this negative or anomalous character. The supplemental bill sets forth the agreement respecting the settlement of the accounts, and then alleges that he, the complainant, was nervous and was overcome, and that his brother took advantage of his weakness and procured the execution of the agreement by his dictatorial manner, and that therefore it is void. The plea denies all the allegations in the complainant's

bill which in anywise tend to make his case. As before stated, the plea copies the account which is mentioned in the agreement, and also the agreement.

This being so, on which party does the law cast the burden? I think upon the complainant. He casts or fashions the issue by his bill and supplemental bill. He presents a case which, if established, entitles him to relief—entitles him to a decree setting aside the agreement. He admits the execution of this instrument, but assails it nevertheless. Clearly, he has the affirmative. Until he sustains the allegations in his bill, this writing and this account must stand, unless the court should permit the complainant to surcharge and falsify the account. I find no exception to this rule. If an account be pleaded in bar to a bill in equity, such plea will be sustained except so far as the complainant can show it to be erroneous. *Chappedelaine* v. *Dechenaux, 4 Cranch 306.* In this case the court observes : "That the plea in bar must be sustained except so far as it may be in the power of the representatives of Chapperdelaine to show clearly that errors have been committed, is a proposition about which no member of the court has doubted for an instant. No practice could be more dangerous than that of opening accounts which the parties themselves have adjusted, on suggestion supported by doubtful or by only probable testimony. But if palpable errors be shown, errors which cannot be misunderstood, the settlement must so far be considered as made upon absolute mistake or imposition, and ought not to be obligatory on the injured party or his representatives, because such items cannot be supposed to have received his assent. The whole labor of proof is upon the party objecting to the account, and errors which he does not plainly establish, cannot be supposed to exist." Although no plea was filed, the defendant relying on an answer, to the same effect is *Nourse* v. *Prime, 7 Johns. Ch. 69.* So in *Perkins* v. *Hart, 11 Wheat. 237*, the court says a settled account is *prima facie* evidence of its correctness.

In *Lockwood* v. *Thorne, 11 N. Y. 170, 175,* it is stated: "That if either party attempts to impeach the settlement and to open the accounts for re-examination, either wholly or in part, and

which can only be done upon the ground of fraud, mistake or error, the burden of proof rests upon the party impeaching, and he must prove the fraud or point out the error or mistake on which he relies." "The stated account is *prima facie* a bar until the particular errors in it are assigned." *Weed* v. *Smull, 7 Paige 573; Pit* v. *Cholmondeley, 2 Ves. Sr. 565; Farnam* v. *Brooks, 9 Pick. 212–218.* In *Freeland* v. *Heron, 7 Cranch 147,* each party insisted that the burden was with the other; but the language of the court was: "When one merchant sends an account-current to another residing in a different country, between whom are mutual dealings, and he keeps it two years without making any objections, it shall be deemed a stated account, and his silence and acquiescence shall bind him, at least so far as to cast the *onus probandi* on him." "If the defendant has fully accounted with the complainant and delivered over all the property and effects which belonged to him, he is not entitled to a new account without showing some fraud or error in the former account." *Fish* v. *Miller, 5 Paige 26, 29.* In this case a plea was put in setting up a release, which release was sought to be impeached by the bill, in which it bears complete analogy to the case being considered. The court said: "If the facts were properly put in issue, and it should turn out on the proofs that the release was absolutely delivered, the release itself would be *prima facie* evidence of such facts."

These authorities are in harmony with the deductions of Lord Redesdale, as expressed in *1 Dan. Ch. Pl. & Pr. 696,* thus: "If, therefore, a plea is allowed upon argument, or the plaintiff, without argument, thinks it, though good in form and substance, not true in point of fact, he may take issue upon it and proceed to disprove the facts upon which it is endeavored to be supported. This he does by filing a replication, in the same manner that he would do if the defendant had simply put in an answer to the bill in the usual way." On page 698 he adds: "If he has in his bill alleged any matter which, if true, may have the effect of avoiding the plea, such as notice or fraud, he may, after replying to the plea, enter into evidence in support of his allegation. And where the plea introduces matter of a

negative nature, such as a denial of notice or fraud, it will be necessary for him, in case sufficient to show the existence of the notice or fraud is not admitted by the answer in support of the plea, to go into the evidence in support of the affirmative of the proposition."

I have referred to the authorities on this point more fully than I should have done had not counsel for complainant, apparently, in presenting their views, relied so confidently upon the conviction that the burden was on the defendent, and pressed it with so much skill and energy. And besides, it is proper to observe that the complainant undertook to maintain the allegations in his supplemental bill. He assumed the affirmative and first examined all his principal witnesses. At no time did he call upon the defendant to maintain the issue until the examination of witnesses had been rested on both sides. Indeed, this method of procedure seemed so sensible and logical, and at the same time so essential, that the complainant pressed into his service every shade and complexion of evidence. I thought then he was not only justified in that course, but required so to do under the pleadings; and the very elaborate argument presented at the hearing has not changed my mind as to the side entitled to and obliged to maintain the affirmative.

The question, however, remains, Are any of the material allegations in the supplemental bill, or the amendment thereto, so far supported by evidence as to justify the court in declaring the agreement void, and in allowing the restatement of the account? In other words, Was this agreement fairly obtained?

The parties were brothers, the complainant being the younger. The complainant had early engaged in business as a country merchant in Hope, and was very successful. In 1866 he commenced business in Trenton. Jacob was admitted to the bar, and, after practicing a short time, moved to Newton and engaged in banking. There is nothing in the case which leads me to conclude that either was endowed with gifts superior to the other; or that opportunities more highly favored one than the other; or that the complainant's misfortunes are to be ascribed to a failure in either. The complainant's misfortunes, financial,

physical and mental, came so nearly simultaneously that it is difficult to tell which fell first or heaviest. No similar catastrophe had visited Jacob, and he was relied upon to relieve Alpheus and his household from the impending financial ruin. This Jacob undertook to do; at least he accepted the trust or agency (it matters not what name is applied), and the law holds him liable to the most faithful discharge of the trust or agency. The law must be our guide. There is a material difference in the principle on which the court deals with settled accounts with reference to those two kinds of decrees, as there undoubtedly is in effect in working them out. A settled account, otherwise unimpeachable, in which an error is proved to exist, may be subjected to a decree to surcharge and falsify, upon the supposition that one error having been proved, others may be expected, upon investigation, to be discovered; but if the relative situation of the parties, or the manner in which the settlement took place, or the nature of the error proved, shows that the alleged settlement ought not to be considered as an act binding upon the party signing, and that it would be inequitable for the accounting party to take advantage of it, the court is not content with enabling the party to surcharge and falsify an account which never ought to have been so settled, but directs the taking of an open account. Amongst the grounds on which the court rests the application of this principle, none are stronger than the fact that the accounting party was the solicitor or agent of the party sought to be charged, or that the circumstances gave him a commanding power or influence over him, or that the facts proved that he possessed and abused the confidence which had been reposed in him. *Coleman* v. *Mellersh*, *2 Macn. & G. 309, 314; Alferey* v. *Alferey, 1 Macn. & G. 87, 93; Brownell* v. *Brownell, 2 Bro. C. C. 62; Pickering* v. *Pickering, 2 Beav. 31; Barrow* v. *Rhinelander, 1 Johns. Ch. 550, 556; Matthews* v. *Wallwyn, 4 Ves. 118.*

These manifold expressions of eminent judges leave no uncertain impressions. It was Jacob's duty to account fully. He had no right to impose any unnecessary or illegal charges. The question is not whether the parties were upon an equal footing or not, but, supposing one to have had advantages, however great,

Is the settlement a just and fair one? Supposed advantages of position, influence or knowledge, will awaken greater caution in the mind of the court and induce a closer inspection; or may require fuller details from the trustee or agent. But still, the question must be, If the complaining party was able to contract, is the account fair and just? The qualification here suggested (Was the complaining party able to contract?) has been thrown into this case by the supplemental bill, and several witnesses were examined with the view of supporting the allegations of incapacity. The allegation is that when the complainant heard the agreement read he was so unmanned, and was so much in fear of Jacob, and his mind and body both in such an unsettled and helpless state, that he was incapable of offering any resistance, and tacitly assented to all his desires, and simply in a mechanical way signed said instrument.

From this it does not appear by what means or in what manner this fear and submission were effected, except the dictatorial manner of Jacob. But accepting the statement as sufficient in itself, I am not satisfied with the proof offered in support of it. On the contrary, the statements of the father, who was also visiting Jacob at that time, and saw the two sons several times while they were together, and before the agreement was signed, and the statements of Mrs. Apgar, a sister, who likewise came on a visit on Monday afternoon (as the agreement was signed the next day, in the evening), while the brothers were engaged at the settlement, most effectually repel the insistment of mental or bodily prostration, as well as the charge of domination and undue influence on the part of Jacob. When Mrs. Apgar went into the hall of the house, her brothers left their room and met her with a hearty and cheerful welcome. The father, Mrs. Apgar and others were there until the paper was signed. From the testimony, I can have no doubt but that complainant had the faculties to understand, and that he did understand what he did, and the legal effect of it, when he signed the agreement. There is nothing to show that the defendant was deprived of his freedom to act. Giving the utmost latitude to the contention that the complainant was laboring under mental weakness, aberrations or

hallucinations at other times, the great preponderance of testimony is that he was not so afflicted on August 21st, 1877.

And looking further at the charge that Jacob had such power or control over complainant as to deprive him of his free agency, it is to be remarked that there is not a single fact or circumstance brought forward, from all their intercourse, that shows the exercise of it on any other occasion. On the contrary, the history of several of their meetings, as given by the complainant, absolutely dispels the charge and appears to render such a result as is contended for, morally impossible. For example, about the 1st day of January, 1874, he says Jacob called at his house in Trenton and wanted to settle on the basis of the account here produced, when, in their disagreement, he (complainant) waxed so hot that he ordered Jacob from his house, and because he did not go, he (complainant) went to a closet and got a weapon and compelled him to leave. With this fact, out of the mouth of complainant, it cannot be urged, as the case now stands, that Jacob accomplished anything by dictation or threats. In addition to this, complainant said that Jacob met him at the Park House, in Newark, at Dover, and at the house of an uncle, in Hope, for the purpose of a settlement, but without effecting any terms. Had Jacob possessed the power of subduing complainant to his wish, it is more than reasonable to suppose that he would have undertaken it on one of these occasions. And it is to be observed that if Jacob's presence or manner had the effect of unmanning the complainant so that he acted without thought or will on the occasion when the settlement was reached, it is remarkable that there is no proof of their unhappy influence at any other period of their lives.

The question of capacity being disposed of, I am again brought to inquire whether or not the agreement was fairly obtained. Whether so obtained or not depends upon the character of the accounts, whether long and intricate, or embracing a variety of subjects, or peculiarly within the knowledge of Jacob, while the complainant remained in ignorance of some material fact, which, if known to him, he probably would have acted upon. I think neither circumstance exists in this case. The subject-matters were

all quite as familiar to the complainant as to Jacob. Indeed the object of the agency was to save the complainant from his creditors by paying the debts, which he had contracted, with the assets, real and personal, which the complainant had on hand for that purpose. The complainant had full knowledge of the existence of the claims, and he had purchased all the assets which he had assigned. The complainant had long been accustomed to balancing accounts both as a merchant and real estate dealer.

There was no surprise; the question was not suddenly thrust upon him. He says that on the 6th of January, 1874, Jacob wanted him to settle on the basis of this same agreement at the house of complainant, in Trenton. After this they had at least three meetings for the same purpose, one of which was at Hope, and the consideration of the subject continued through two days. In August, 1874, the bill in this cause, which involves these accounts, was filed. The statements in this bill show that the complainant could not have been taken by surprise August 21st, 1877. And the correspondence offered, and other evidence, show that the subject of dispute was very frequently agitated after the filing of the bill, in other ways than by meetings between the parties for that purpose.

These same considerations show with equal force and certainty that the complainant was not ignorant of the subject-matter, nor of the details, nor of the methods pursued by Jacob, nor of the principles upon which Jacob proposed to settle.

Again: I think these views are more firmly impressed by a consideration of the complainant's conduct after the settlement. This was in the evening, The complainant and his family remained with Jacob until next morning. Before leaving for his home he told the cashier of the bank of the settlement, and expressed his satisfaction therewith. He carried the agreement home and placed it in his safe; and it does not appear, except from allegations in his supplemental bill, that he ever was dissatisfied, in Jacob's lifetime, although, when he told his counsel, soon after the settlement, he says his counsel told him he had been greatly wronged. He also says that after the act, he felt that he had done an unwise and foolish thing.

13

It is likewise to be remarked that if complainant, after reflection, concluded that Jacob had obtained an unfair advantage in the settlement, or that he had acknowledged an indebtedness, in his weakness, when, upon a fair accounting, the liability was the other way, and his counsel had told him he had been greatly wronged—if, with such reflections and such knowledge, he had not kept silent too long in not speaking until after Jacob's death, such delay (over four years) weighs heavily against him. Indeed, on the question whether this agreement was fairly obtained or not, it seems to me to be quite insurmountable. It is true, accounts are opened after ten, twenty and even forty years, and often after the death of the party sought to be charged; but I apprehend that courts of equity require the aggrieved party to move promptly after he discovers the error, mistake or fraud. *Stout* v. *Seabrook's Exrs., 3 Stew. Eq. 187.*

But notwithstanding any of these considerations, it would be a reproach to the character of a court of equity to plant its judgments upon forms or technicalities, or mere lapse of time in such cases, if it became apparent that the defendant holds a portion of the money or estate of the complainant, unless the complainant should stand aloof in the spirit of speculation, taking advantage of the death of important witnesses or the destruction of documents. To this stage we are carried by the pleadings and proofs before us. And with this in view, in the midst of the trial, the court allowed an amendment to the supplemental bill, so that if the release itself should stand, and palpable errors appear, the complainant might proceed upon the sure ground of surcharging and falsifying the account. But I cannot find anything in the case to justify me in allowing the complainant to move to that extent. I think his hand should be stayed. It was the intention of the parties to bury their disputes and to forever put to rest their differences under this settlement. It was a compromise. The supplemental bill makes this most plain. The complainant's mind was brought to that point by the earnest solicitations of his wife and father. In the language of Lord Langdale: " When parties whose rights are questionable have equal knowledge of facts, and equal means of ascer-

taining what their rights really are, and they fairly endeavor to settle their respective claims, amongst themselves, every court must feel disposed to support the conclusions or agreements to which they may fairly come at the time." *Pickering* v. *Pickering, 2 Beav. 31, 56.*

In my judgment, the complainant has not established the allegations in his supplemental bill nor in the amendments thereto, and I shall therefore advise a decree that they be dismissed, with costs. I shall advise that the original bill be dismissed, but without costs, since that was pending at the time of the settlement, and the costs must have been included therein.