### NOURSE *against* PRIME, WARD, and SANDS.

The defendants, being stock and exchange brokers, in the course of their business, received of the plaintiff 430 shares of *United States'* bank stock, and which, it was agreed, in *February*, 1818, that they should hold, as collateral security for the payment of a note given to them by the plaintiff, for advances to him, and payable on the 10th of *January*, 1819, and that they should be at liberty, in case the note was not paid, at the time, to make immediate sale of the stock, accounting to the plaintiff for any surplus, and holding him responsible for any deficiency. The shares of the plaintiff were not marked or identified as his particular property, or kept separate and distinct, but were blended with the mass of shares of the same stock, held by the defendants, belonging to themselves, and in trust for others : *Held*, that as the defendants, at all times, since the giving of the note by the plaintiff, were possessed of shares standing in their names, and under their absolute and rightful control, and subject to no contract, to an amount far exceeding the number of the shares so deposited with them, by the plaintiffs, and were ready and able, at any time, to transfer the 430 shares to the plaintiff, on payment of the note,—they were not bound to account to the plaintiff, for his stock, at the *highest price*, at which shares were sold by them at any time during that period ; but that the like number of shares, held by the defendants when the note became due, were to be considered as the shares so deposited by the plaintiff; and which the defendants were at liberty to sell according to the agreement, to reimburse the amount of the note, which remained unpaid.

*June* 29th and *July* 19th.

THE defendants, who are stock and exchange brokers in the city of *New-York*, and had purchased shares of

*United States'* bank stock for the plaintiff, and had received a transfer of other shares for the plaintiff, making together four hundred and thirty shares in their hands. On the 6th of *February*, 1818, they rendered to the plaintiff a general account of their transactions, in which a balance was found due to them from the plaintiff, of 53,917 dollors, 15 cents, for which the plaintiff agreed to give his note to the defendants; and the plaintiff accordingly gave to the defendants his note for 54,200 dollars, including cash advanced to him, of 282 dollars, 95 cents, payable on the 10th of *January*, 1819, with interest at 7 per centum, payable half yearly. The defendants retained the 430 shares of stock in their hands, as collateral security for the payment of the note, and gave to the plaintiff a receipt, as follows: " We acknowledge to hold 430 shares of *United States'* bank stock, as collateral security for the payment of the said note, dated the 24th of *December* last, for 54,200 dollars, payable on the 10th of *January* next, with interest, at 7 per cent., &c. on the payment of which note and interest we engage to re-transfer the said 430 shares to the said *Charles I. Nourse*, or his order, accounting with him for the dividends that shall become payable on the same; and in case the note and interest are not duly paid, we are at liberty to make an immediate sale of the said shares, accounting with him for any surplus, and holding him responsible for any deficiency. *New-York*, 11th of *February*, 1818." The bill charged that the defendants did obtain or might have obtained certificates from some proper officer of the bank, distinguishing and identifying the said shares, as the proper shares of the plaintiff; and might and ought to have guarded against the casualties and misfortunes of trade, by endorsing the name of the plaintiff, or by putting some distinguishing mark on such certi⸱⸱ates, designating the same as the property of the plaintiff, and to prevent the said shares from being mixed in a common fund with other shares of the *United States'* stock which the de-

fendants may have held on their own account, or as trustees for others. The bill further charged, that the defendants, during the year 1818, having also in their hands a large number of shares of the said stock, held together in trust for various persons, and on their own accounts, and as agents for others, speculated in the said stock, by selling and buying shares, as the price in the market rose or fell, and did, at divers times, during the year 1818, sell all the said shares belonging to the plaintiff, at a great advance, without the knowledge or consent of the plaintiff, and received therefor, 65,600 dollars, &c.: and at one time during the said period, had not in their hands any shares of the said stock, or at least, not equal to the number of shares belonging to the plaintiff. That at the close of the year, when the price of the said stock had become greatly depressed, in order to realize the profit to themselves, on sales so made by them, in *breach of trust*, &c. they did, on the 14th of *December*, 1818, write to the plaintiff, that his note would fall due in *January*, and offering to extend the payment of forty-three thousand dollars of the amount. retaining the shares as their security, &c. The bill further charged, that the defendants could not exonerate themselves as trustees to the plaintiff and others, by alleging, that they would have replaced the 430 shares of the plaintiff, out of a common and mixed fund, which, by repeated breaches of trust committed against the plaintiff, they had rendered totally inadequate to the performance of the trusts committed to them, and with which that fund was connected, and could not have replaced the shares of the plaintiff, without committing similar breaches of trust towards some other persons. That if the defendants have mixed the shares of the plaintiff with other shares, or have neglected to take proper vouchers to identify the shares of the plaintiff, they have acted contrary to their duty as trustees, and subjected the plaintiff to the risk of losing his shares by their insolvency. That the defendants ought, therefore, to ac-

count to the plaintiff for his 430 shares, at *the highest rate* at which the defendants may have sold any shares of the *United States'* bank stock, at any one or more times, since the 11th of *February*, 1818, amounting, in the whole, to 430 shares, as well as for the dividends which accrued on the shares so sold. That the defendants, on the 25th of *January*, 1819, sold, at the then depreciated value of the stock, 430 shares out of those of their own, held at that time, or which they may have purchased since the making of the note, for account of the plaintiff, and as and for his 430 shares; and have brought an action at law on the note, against the plaintiff, at *Boston*, where he resides, to recover the alleged deficiency between the amount of the note and interest, and the amount of the proceeds of such sale. *Prayer* for a discovery, and that the sale of the 25th of *January*, 1819, be declared null and void, as to the plaintiff, and that the defendants be restrained from further proceeding at law, on the note, &c.

The defendants, in their *answer*, stated, that the plaintiff, in *December*, 1817, urged the defendants to extend the time of credit for their advances, and proposed that they should have the entire control of the stock, and might use it in aid of their financial operations, and that his sole object was to secure to himself the benefit of the expected advance of price, by having a right to call on the defendants for the same number of shares, at the expiration of the proposed period of credit, which proposal was agreed to by the defendants. That it was not the practice of the defendants to take out *certificates* for shares of stock standing in their names, until they wanted to use them. And they denied that they ever did take any certificates to *identify* the 430 shares of the plaintiff, or were ever requested to do so. That the plaintiff well knew that, according to the course and practice of doing business in this respect, there was not any such identification of the shares. They denied, that they ever did sell, pledge, or otherwise dispose of the whole,

or any part of the 430 shares, as charged by the plaintiff. That although all the shares which were, from time to time, transferred to the defendants, were placed, without discrimination, in their names, and constituted one common mass or fund, subject to their control, &c. yet that there was no time, during the year 1818, at which they were not possessed of shares standing in their own names, at their absolute control, to an amount far exceeding the 430 shares, nor was there, during that period, any moment at which they could not have been ready, willing, and able to have transferred the said 430 shares to the plaintiff, on payment of their note, &c. That the least number of shares of the said stock, which they have had, at any time, since the 11th of *February*, 1818, in their possession, standing in their own names, and under their absolute control, and for the sale of which no bargain was made with any person, was 1,930 shares. They denied, that the shares of the *United States'* bank stock, in their possession, of their own property, and of the property of others, were ever so reduced, by sales or contracts, during the said period, as to be less than the number of the shares of the plaintiff, and of the shares of others entrusted to them to be retained, &c. They denied that they had ever committed any breach of trust towards the plaintiff, or any stockholders, or disposed of any shares without authority, or that the mass of shares under their control, was ever rendered inadequate to the performance of the trusts committed to them by the owners, or that they were incapacitated to replace the shares of the plaintiff, without committing a breach of trust towards some other person, &c.

On the coming in of the answer, a motion was made to dissolve the injunction which had been granted.

*June 29th.*     *Harison* and *Wells*, for the defendants.

*T. A. Emmet*, for the plaintiff.

THE CHANCELLOR. As all the equity of the bill sustaining the injunction, is fully denied in the answer, the motion to dissolve the injunction ought to be granted.

The contract upon which this suit arises, was reduced to writing, and is contained in the receipt or acknowledgment given by the defendants, and accepted by the plaintiff. It precludes all misunderstanding and uncertainty, by the full and precise terms in which the agreement is declared. The defendants acknowledge, that they " hold 430 shares of *United States*' bank stock, as collateral security for the payment of the note, &c., and that, on payment of the note and interest, they engage to re-transfer the said 430 shares to the plaintiff, or his order, accounting with him for the dividends that shall become payable on the same ; and in case the note and interest were not duly paid, they were at liberty to make an immediate sale of the shares, accounting with him for any surplus, and holding themselves responsible for any deficiency." As the defendants, at the time, carried on the business of stock and exchange brokers, and as the plaintiff dealt with them in that capacity, he should have caused the shares to have been identified, if he intended that they should have been kept distinct and separate from the mass of stock in which the defendants dealt. The shares in question were not defined and designated, so as to be distinguished from other bank shares in the same bank ; and if the defendants had always, in their possession and names, and under their control, shares to that amount, during the whole time of credit given by the note, and were ready, able and willing, at all times, to account to the plaintiff for that number of shares, and the dividends arising thereon, whenever he entitled himself to such an account, it is all that he could ask under the contract. The answer is explicit on this point, and while it admits, that the shares in question constituted part of one indiscriminate mass, or fund of stock placed in their names, and subject to their control, and from which they, from time to time, made such transfers

1820.

NOURSE
v.
PRIME.

*July* 19th.

1820.

NOURSE
v.
PRIME.

and appropriations as the exigencies of their business and engagements required; yet, it avers, that there was no time, during the year 1818, in which they were not possessed of shares standing in their own names, at their absolute and rightful control, subject to no contract of sale, to an amount far exceeding the shares deposited by the plaintiff; nor was there any moment at which they would not have been ready, and willing, and able, and rightfully able, without any breach of trust to others, to have transferred the said shares to the plaintiff, upon payment of his note. What colour of equity, then, has the plaintiff to call on the defendants to account for the sale of the like amount of shares, at the highest price obtained during that year? Nothing could be more unreasonable or unjust. The defendants were not bound to separate 430 shares from the common stock, and mark, or otherwise designate them as the separate property of the plaintiff, inasmuch as the plaintiff had left the shares undefined, and was content to take from the defendants a certificate to return, generally, " 430 shares of *United States'* bank stock." It is sufficient, under this contract, that the defendants always had the requisite quantity of shares on hand, and the law will presume that the shares so on hand, from time to time, *were the shares deposited*, because the parties have not reduced the shares to any more certainty. We must take the contract as we find it, and are not bound to enter into a labyrinth of inquiry and accounts to see if we cannot mend it. The plaintiff has no right to call for an account of the profits made on a like number of shares, when the defendants always had a sufficient quantity to comply with the contract, and when the plaintiff is not able to point out which were his shares.

*Pothier*, in one of his plain and familiar illustrations, supposes the case of a quantity of wheat deposited with another, and in a season of scarcity, the magistrate compels the bailee or creditor to bring that wheat to market, and sell it, he is then responsible for the price of it, which becomes a

substitute for the pledge in specie. This is obviously just and true ; but let us suppose that *A.* had acknowledged that he had 100 bushels of wheat received into his possession, belonging to *B.*, and which he held as a collateral security, and that the wheat had been mixed in, and constituted a part of one promiscuous heap of 1,000 bushels, in which *A.* was constantly trafficking, and that all this was in the view and knowledge of the parties, at the time ; would not *A.* have a right to continue buying and selling wheat, and be making constant additions to, and constant substractions from that heap, *without being chargeable with selling the wheat of B.*, so long as he always had, at least, 100 bushels of like quality in his granary, subject to his disposition and control, and ready for *B.* whenever he had a right to demand it ? Most certainly ; and if a person will suffer his property to go into a common mass, in this way, without having put a mark upon it, by which it can be identified, he clearly has no right to ask any thing more than that the quantity he put in should always be there, and ready for him. By just fiction of law, that *residuum* shall be presumed to be *the portion he put in.* It may as well be that as any other portion of the heap, and he has no right nor means to gainsay it.