WILLIAM PRICE and Wife *vs.* GERARD GOVER and others.

*When parol Evidence may be admitted to show the true character and purpose of a Mortgage—Mortgage of Indemnity— What constitutes a sufficient Carrying of Stock by a Broker for a Customer.*

A mortgage executed by P. and wife, recited that P. stood justly indebted to L. & Co. in the full sum of $30,000, upon his six promissory notes, drawn by him to their order each for $5000, dated the 1st of October, 1857, and payable two of them at six, two at nine, and two at twelve months, and all bearing interest from date, and that the mortgage was executed to secure payment of the said sum of $30,000 and interest, agreeably to the tenor of the said notes. After the usual conveyance and defeasance clauses and assent to a decree for a sale, there was the following: "Memorandum— Whereas the parties hereto of the second part as copartners aforesaid, are the holders of eleven hundred and fifty shares of the capital stock of the Baltimore and Ohio Railroad Company, which they have agreed to carry for and on account of said P. for the period of twelve months from the first day of October, 1857, at forty-five dollars per share; now it is hereby declared to be the express agreement and understanding of the parties hereto, and one of the considerations for making this mortgage, that in case of a sale of said railroad stock, or any part thereof during said period of twelve months, at an advance over forty-five dollars per share, such advance is to be credited to the said P. on account of the debt secured by this mortgage, and likewise that all dividends received by said parties of the second part on said stock during the period aforesaid is to be credited on account of the said debt hereby secured." This mortgage being assailed for fraud by a bill in equity, filed by the mortgagors against the mortgagees and the trustee appointed to sell the mortgaged property, it was HELD:

1st. That parol evidence was admissible for the purpose of showing the true character of the instrument, for what consideration it was given and what purposes the parties to it intended it should subserve.

2nd. That it was simply a mortgage of indemnity—its sole purpose being to secure L. & Co. against loss in carrying the eleven hundred and fifty shares of stock to the extent of their sales as low as $45 per share, they taking upon themselves the risk of all additional loss that might be incurred by a sale at a less rate.

Where a broker agrees to carry for and on account of a customer, for the period of twelve months, a certain number of shares of railroad stock, at a specified price per share, he is not bound to retain in his possession during the pendency of the carrying contract, the identical stock which he agreed to carry; he may sell the whole or any part thereof; all that the law requires of him is, that during the pendency of the contract he should have on hand, in his possession, or under his control, an equal number of other shares of the same stock, ready for delivery when his customer should pay what he owed on account thereof, or to be sold on his account when he should so direct.

APPEAL from the Superior Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., GRASON, MILLER, ALVEY and ROBINSON, J.

*Thomas W. Hall, Jr.* and *S. Teackle Wallis*, for the appellants.

*William A. Fisher, Wm. Henry Norris,* and *I. Nevett Steele,* for the appellees.

MILLER, J., delivered the opinion of the Court.

The appellants, on the 6th of October, 1857, executed to the firm of Josiah Lee & Company a mortgage of certain real and leasehold property in the City of Baltimore. This mortgage contains the assent of the mortgagors to a decree for a sale under the Act of 1833, ch. 181, and its supplements, and upon petition of the surviving partners of the firm, a decree to that effect was passed by the

Superior Court on the 3rd of May, 1860. The bill in this case filed by the appellants on the 29th of June, 1860, charges that this mortgage is fraudulent and void, and prays that it may be vacated, the decree set aside, and for an injunction against the sale of the property thereunder. The injunction was granted, and after answers and replication, testimony was taken at various times between the 20th of June, 1862, and the 8th of June, 1873. The case was then brought to final hearing, and the Superior Court, on the 15th of July, 1873, passed a decree dissolving the injunction and dismissing the bill, and from that decree this appeal is taken.

In view of the large interests at stake as well as the very able and earnest arguments at bar by counsel on both sides, we have given to the case a full and careful consideration. Especially have we done this in reference to the voluminous testimony in the record; for upon the conclusions to be drawn from that, rather than upon the solution of any difficult questions of law, our decision must rest. It cannot however be expected of us that we should in this opinion review in detail all the mass of proof in the case, and comment upon each item of testimony contributing to the formation of our judgment. All that we can do is to state the general features of the case as we find them established by the evidence, and our conclusions upon such controverted questions as are important, and upon which the reversal or affirmance of the decree appealed from must depend.

At the time of the transactions in question the appellant, Price, was a man advanced in years, uneducated, being unable to read or to write more than his name, but of good natural capacity and judgment, perfectly capable of contracting, and well able to protect himself in his business operations. He lived in the City of Baltimore, and owned there valuable property and his credit was good. Lee & Company were doing a large business as bankers

and stock-brokers in the same city. In or prior to May, 1857, Price had purchased through Purvis & Co., another firm of brokers 1000 shares of Baltimore and Ohio Railroad stock which they were holding for him, and for which he was indebted to them in the large amount of $67,109.90, payable when the transfer books of the company should be re-opened, viz. on the 26th of that month. It being inconvenient for him to make this payment, and Purvis & Co. desiring it to be paid, he entered into an arrangement with Lee & Company to carry the stock for him, that is to say, that they should pay Purvis & Co., the amount due on the stock, receive it from them and retain it for him and on his account, to be delivered to him or sold whenever by the terms of their agreement, a delivery or sale could be required. Lee & Company accordingly, on the 26th of May, 1857, paid to Purvis & Co., the whole $67,109.90, and took the stock into their possession. On that day the stock was selling for $52 per share, so that they advanced $15,109.90 more than its then market value. In June and August following they purchased by his order 550 other shares of the same stock, and agreed to carry 150 of them in the same way as the 1000 shares, thus bringing 1150 shares within the terms of the contract. The remaining 400 shares of these subsequent purchases they sold by his order and rendered him an account of sales, which resulted in losses. There is a conflict in the testimony as to *how long* this stock was to be carried under the terms of the original agreement, whether so long as Price might choose to keep it unsold or only so long as either party should desire it. It is not important to determine this question because, whatever may have been the terms of the original agreement, they were superseded by the *memorandum* contained in the mortgage of the 6th of October, 1857, by which a new and definite contract in writing respecting the carrying of these shares was made, and our duty is to decide upon the validity of that instrument.

This mortgage recites that Price "stands justly indebted" to the firm "in the full sum of $30,000" upon his six promissory notes drawn by him to their order, each for $5000 all dated the 1st of October, 1857, and payable two of them at six, two at nine, and two at twelve months, and all bearing interest from date, and that the mortgage is executed to secure the payment of said sum of $30,000 and interest agreeably to the tenor of these notes.   Then after the usual conveyance and defeasance clauses and assent to a decree for sale there is the following :

"*Memorandum*—Whereas the parties hereto of the second part as co-partners aforesaid, are the holders of eleven hundred and fifty shares of the capital stock of the Baltimore and Ohio Railroad Company, which they have agreed to carry for and on account of the said William Price, for the period ;of twelve months from the 1st day of October, 1857, at forty-five dollars per share; now it is hereby declared to be the express agreement and understanding of the parties hereto, and one of the considerations for making this mortgage, that in case of a sale of said railroad stock or any part thereof, during said period of twelve months, at an advance over forty-five dollars per share, such advance is to be credited to the said William Price on account of the debt secured by this mortgage, and likewise that all dividends received by said parties of the second part on said stock during the period aforesaid, is to be credited on account of the said debt hereby secured."

Before considering the direct question of the validity of this instrument, it is important to dispose of a preliminary one as to its character and purpose.   It has been strenuously argued on the part of the appellees that there was at this time a settlement of accounts between the parties, and that the mortgage was given to secure an ascertained *debt* or balance of $30,000, then due to Lee and Company, not only for loss upon the 1150 shares, but also

for losses which had accrued on the purchase and sale of other shares by them on Price's account. But we do not think this position can be sustained. The answer, which was carefully prepared after an examination of their books, and sworn to by all the defendants, takes no such view of the purpose of this mortgage. On the contrary it avers in reference to the purchase and sale of other shares, that they were all made in June and August, 1857, and resulted in a loss of nearly $7000, for which they demanded cash in pursuance of their agreement with Price, under which such purchases were made, but were unable to obtain it, and were finally compelled to accept his two notes, one for $3387 and the other for $3387.40, therefor, payable respectively on the 27th and 29th of June, 1858, both of which still remain due and unpaid: and in reference to the mortgage the averment is, that some time prior to the 6th of October, 1857, they demanded it "in order principally to secure them against any loss which had arisen or might arise out of their contract for the carrying of said 1150 shares of stock;" that they required of Price that he should pass to them his notes for "a sum of $30.000" and he accordingly did so, and executed the mortgage, "and they agreed to carry 1150 shares of stock for his account for a year from the 1st of October, 1857, a memorandum of which new agreement made on the execution of the mortgage is appended thereto." The proof also seems to us opposed to this theory of the case. Reese one of the partners of the firm, and their witness, when asked to state the principles on which the account was adjusted at the time the mortgage was executed says, "Price was to give his notes for the amount of his indebtedness *estimating the stock* at the amount of $45 per share, and we were to carry the stock for one year; the notes represent the difference between $45 per share and the cost of the stock and interest and commissions; this made up the sum of $30,000;" and in reference to the purchase of other shares

besides the 1150 the same witness testifies that such pur-
chases were made and that account W. H. N. No. 3 shows
*correctly* the prices and *times* at which such additional
shares were purchased and sold; that there was a loss of
$6480.90 on 300 shares of such purchases which was *settled*
by the notes of Mr. Price, *before the mortgage was given,*
which notes have not been paid. By reference to account
W. H. N. No. 3, which is but a copy in this respect, of
account W. P. No. 2, we find no entries of any purchases
and sales of stock besides the 1150 shares, except in June
and August, 1857, or of any notes of Price save the mort-
gage notes and the two for $3387 and $3387.40 due as the
accounts state, June 27th and July 29th, 1858; and
these two we infer to be the same, referred to in the
answer and in the testimony of Reese. We find no proof
in the record from which the inference could be drawn
that there was any purchase or sale of stocks after the
mortgage except a *debit* in these accounts of $6480.90 as
of October 20th, 1857, for *loss* on 300 shares bought and
sold as per statement rendered, and we cannot escape the
conclusion that this loss was on account of purchases and
sales in June and August, 1857, and that it was *settled* by
the notes of Price referred to in the answer and in the
testimony of Reese. These notes were not due when the
mortgage was given, and it makes no reference to them as
forming any part of the consideration for its execution.
By no computation we are able to make, can the amount
of these notes be brought in to fit and make up the sum
of $30,000 mentioned in the mortgage, and we are satisfied
that for whatever loss resulted from stock transactions out-
side of the 1150 shares, the appellees trusted to the indi-
vidual responsibility of Price and accepted his notes in
settlement thereof before the mortgage was given, and that
such loss formed no part of its consideration. Such would
be our conclusion from the answer and the testimony of
Reese already referred to. But in addition to this, the

same witness, on cross-examination, testifies that the transaction amounted to nothing more than giving the notes and mortgage as margin upon the contract to carry at $45 per share, except that we took the risk of the stock going below $45 per share. So also George P. Gover another member of the firm, in answer to the question, "was there any understanding or intention so far as you know, on the part of your firm that Price's mortgage was given or was to be given as for an indebtedness already ascertained, or for any other purpose than as a guaranty or margin to protect your firm against loss on the carrying of the stock?" says, "the *only* consideration was that the mortgage was to protect Josiah Lee & Company against loss from carrying the stock." There can, we think, be no doubt that, in a case like this, in equity, where the mortgage is assailed for fraud, such evidence is admissible for the purpose of showing the true character of the instrument, for what consideration it was given, and what purposes the parties to it intended it should subserve. We are therefore of opinion, notwithstanding the formality of passing notes, and the use in it of the terms "*debt*" and "*indebtedness*," the sole purpose of this mortgage was to secure Lee & Company against loss in carrying these 1150 shares of stock to the extent of their sale as low as $45 per share, they taking upon themselves the risk of all additional loss that might be incurred by a sale at a less rate. Viewed in this light it is simply a mortgage of indemnity and so we pronounce it. Our judgment on this question would be the same, whether the original understanding contemplated the giving of such a mortgage or whether it was executed upon the subsequent demand of the mortgagees.

This being the purpose and character of the mortgage, we must now determine the question of its validity. The *onus* of proof in this respect rests of course upon the parties assailing the instrument. They must show affirmatively,

and clearly its invalidity.    The grounds upon which they assail it are :

1st.  A total failure of consideration for its execution by reason of the absolute failure in fact of the appellees to carry the stock according to their agreement.

2nd.  Actual fraud and imposition practiced by them upon Price by which he was led to execute it.

1st.  As to the first ground, the bill charges in substance, that the defendants did not, as they pretended, carry the said 1150 shares or any part of them, but on the contrary parted with every share thereof for their own use and bene- fit without the knowledge or consent of Price, before the mortgage was executed, and pretended to be, while they were not in fact the holders of any such stock of his, and therefore could not carry it, or in any wise discharge their obligation to him under their contract, and at no time did they incur loss or risk of loss on his account in regard thereto, and especially had not at the time of the execution of the mortgage any of these 1150 shares of stock in their possession, and had no honest claim upon him in the prem- ises, or any ability to do that which alone would have fur- nished a consideration for the mortgage.    By this it is assumed, in the first place, that it was the duty of Lee & Co., to retain the *identical shares* which they received from Purvis & Co., and the 150 which they subsequently pur- chased, and to hold them ready to be delivered, or sold whenever by the terms of their contract a delivery or sale could be lawfully demanded or made.    But in our judg- ment it is quite clear the law did not impose that duty upon the brokers.    In the case of *Worthington vs. Tormey*, 34 *Md.*, 193, it was decided by this Court that where a broker is employed to purchase stock for a customer, it is not necessary that the stock so purchased, shall, until delivery, be kept separate and apart from other like stock belonging to the broker, or that he should mark and designate it as belonging to the customer, but if either he or his agents,

through whom the purchase was made, had such stock in their possession, so that it could be delivered to the customer upon his paying what was owing for it, that was all the law required him to do. To the same effect is the decision of Chancellor KENT in *Nourse vs. Prime, et al.*, 4 *Johns. Ch. Rep.*, 490, and 7 *Ibid*, 69, where there was a written agreement by which the brokers acknowledged that they "held 430 shares of *United States* Bank stock, as collateral security" for the customer's note payable at a future time, and engaged on payment of that note "to retransfer the said 430 shares to" him or to his order, accounting to him for the dividends payable on the same during the running of the note, and in case the note was not paid at maturity, they to be at liberty to make an immediate sale "of said shares" accounting with him for any surplus, and holding him responsible for any deficiency. In that case, as in this, the defendants carried on the business of stock brokers, and the CHANCELLOR held that as the plaintiff dealt with them in that capacity, he should have caused the shares to have been identified if he intended they should be kept separate and distinct from the mass of stock in which the brokers dealt; that the shares in question were not defined and designated so as to be distinguished from other shares in the same bank, and if the defendants had always in their possession and names, and under their control, shares to that amount during the whole time of credit given by the note, and were ready, willing, and able at all times to account to the plaintiff for that number of shares, and the dividends arising thereon whenever he entitled himself to such an account, it was all that he could ask, under the contract; that the brokers were not bound to separate 430 shares from the common stock, and mark or otherwise designate them as the separate property of the plaintiff, but that it was enough if the brokers always had the requisite quantity of shares on hand, "and the law will presume that the shares so on hand

from time to time, *were the shares deposited*, because the parties have not reduced the shares to any more certainty." To the same effect also, are the decisions of the Court of Appeals of New York in *Horton vs. Morgan*, 19 *N. Y. Rep.*, 170, and *Stewart vs. Drake, et al.*, 46 *N. Y. Rep.*, 449.

It was no part of the contract, nor was it, in our opinion, contemplated by the parties that the stock should be transferred to Price, and certificates therefor issued to him, and that he should then by power of attorney transfer and deliver them to Lee & Co. He never required this to be done, but on the contrary allowed Purvis & Co. to transfer the 1000 shares directly to Lee & Co., and we think it is fairly to be inferred from the nature of the transaction, as well as from the evidence in the record, that this was the intention and understanding of both parties when the contract was made. It was therefore, according to the authorities we have cited, no breach of any legal duty or obligation resting upon the appellees under either the prior verbal agreement or that contained in the mortgage, to sell the whole or any part of the shares originally received and purchased on Price's account, *provided* they had, at all times during the pendency of this carrying contract from its inception in May, 1857, to its close by the sales in June, 1859, on hand, in their possession or under their control, ready for delivery when Price should pay them what he owed them on account thereof, or to be sold on his account when he should so direct, an equal number of other shares of the same stock. But it was their duty so to keep on hand *unsold* this number of shares. Have they failed to discharge this duty? The bill charges they have, the answer denies it. We have carefully examined the testimony by which alone this question must be determined, and our conclusion from it is that it fails to establish clearly a breach of duty in this respect on the part of the appellees. It is shown there was not at all times this amount of stock standing in their names on the

transfer books of the Railroad Company, but we cannot infer from this that they did not *own* or have control of that number of shares. It is very manifest they could be the owners of a much larger number by holding certificates therefor, under blank powers of attorney without any transfer to themselves appearing on the company's books. In response to the demand in the bill for the respondents to show fully how much of this Railroad stock they held and owned on the 26th of May and the 6th of October, 1857, and at various other designated dates, the answer sets forth a specific number on each of these dates as being held and owned by them. These amounts are in each case more than 1400 and in some largely over 2000 shares. Reese in his examination in chief testifies on this subject to the effect that from the origin of this transaction down to the ultimate sale of the stock in June, 1859, the firm had on hand, that is by hypothecation and control of, an adequate amount of stock over and above what they were carrying for other parties, to have delivered on call what they were carrying for Price; that it did not always stand in their names on the books of the Railroad Company, for the reason that when the stock was hypothecated it was usually transferred into the name of the party who advanced upon it. On cross-examination he is more explicit, and swears that during the running of the contract with Price, the firm had always on hand or under its control sufficient of this stock to meet all its contracts with all its customers; that by having stock under their control he meant having command of it, and being prepared to deliver it; that they held their Baltimore and Ohio Railroad stock in such a position, as to be at all times ready and prepared to comply with all their contracts on call, and were not obliged *to buy* for that purpose, but though not obliged to buy they would have been under the necessity of disembarrassing their stock from hypothecation, or other liens in order to be able to deliver it. From this and other

portions of his testimony it is clear that while hypothecation is admitted, a *sale* to the extent of touching the 1150 shares is explicitly denied. This witness was not only competent to testify at the time he was examined, but he had then no interest in the result of the suit. He had also the means of knowing that to which he has thus positively sworn. We have carefully considered the arguments so earnestly pressed by the appellants' counsel against this testimony, but they have not convinced us it is our duty to refuse it credit. It is insisted the firm all this time was actually insolvent and could not have had the ability to meet a demand for the delivery of this stock without fraud, bad faith or breach of trust, as to their other customers or creditors, and that, such insolvency is shown not only by the testimony of some of the witnesses, but by the extent and character of their failure in October, 1860. But in opposition to this there stand the undoubted facts that they purchased and paid for this stock a very large sum of money ; that they had means and credit sufficient to continue their business during the whole time covered by the transactions with Price, a period of great financial trouble ; that they did not exercise their right to sell immediately after the expiration of the year, but allowed eight months more of credit to Price, and then after giving him due notice, actually produced the stock, sold it and delivered it to the purchasers, and credited the account of Price with the proceeds ; and that their failure did not take place until *more than sixteen months after such sale.* Their failure at that time, complete and disastrous as it was, does not justify the conclusion they had not this stock on hand or under their control up to the time of its sale ; nor will that, or any other evidence in the record, warrant us in pronouncing positive testimony that they did so hold and have control of the stock, fabricated and false. We are therefore of opinion there was no *sale* of this stock amounting to a breach of duty on the part of the appellees.

But it is conceded they hypothecated it, and the next inquiry is, was this a breach of duty on their part?    The case does not call for the decision of the broad question whether under a contract to purchase and carry stock on a margin to be kept good by the customer, the broker has the right to hypothecate the stock for the purpose of raising money upon it, because we are satisfied from the evidence that when this arrangement was entered into, it was understood between the parties that the appellees, in undertaking to carry the stock, were to be at liberty to use it for the purpose of enabling them to do so.    Price, in his testimony, admits that, at the time he entered into this arrangement with the appellees, Purvis & Co. were carrying for him 400 other shares of the same stock, and in reference to this carrying, he says "Purvis took them up and *borrowed money on them, and that is the way they were carried,* that is *the way I got him to do it."*    There is nothing to show he could reasonably have expected Lee & Co. to deal differently with the 1000 shares they agreed to take up, but on the contrary, it is very clear he must have expected they would deal with them in the same way, for he says that when the arrangement respecting the 1000 shares was proposed, Gover, the partner to whom it was made, said to him we can carry them for you, and that he knew where he could lay his hands on $60,000 ; that when he reported to Purvis that Lee & Co. had agreed to carry the 1000 shares, Purvis said "they are not able, they are from hand to mouth, for they are borrowing every day," that he then told him that Gover had said he knew where he could put his hands on $60,000, and Purvis then replied, "by the help of outsiders they may be enabled to carry it."    Again, he testifies that he told them before they took the stock, that he had no money, it was all in their hands ; that they knew he had no money from the start ; that they knew he was carrying the 400 shares, and knew all about it as well as he did.    He was, therefore,

according to his own testimony, informed beforehand they would be obliged to borrow money to carry the stock, and according to the testimony of Reese, he was informed by the latter in frequent interviews and conversations, that they had borrowed money on the stock by hypothecating it, and that was the manner in which it was carried, and to this no protest or objection on his part was made. We cannot escape the conclusion that it was part of the original agreement and understanding that the brokers should in this case have the power of hypothecation. There was, therefore, no violation of their duty in this case, even if that power would not, without an agreement to that effect, express or implied, remain with the broker, under a contract to carry stock on a margin, a point upon which we wish to be understood as expressing no opinion.

2nd. We find no proof upon which the charge that actual fraud and imposition were practiced by the appellees upon Price, by which he was led to execute the mortgage, can be sustained. There was no attempt to take advantage of his inability to read. The mortgage was prepared by his own directions, and by his own conveyancer, in whom he had confidence, and whom he trusted to prepare all his deeds, and it was carefully read over to him before he executed it. There is nothing in it to which he did not give his full assent. He understood what a stock operation of this kind meant. When he engaged in it he hoped to make money, but he knew he ran the hazard of loss. He acted intelligently, with his eyes open, and we cannot discover that he has been in anywise cheated, defrauded or deceived. In this connection our attention has been particularly called to the testimony of Price, that at one time he gave an order to sell the stock which they failed to execute. His testimony is, "I think about August, 1857, I gave Josiah Lee & Co. a written order to sell that stock at $65 per share, but not less; they did not do it, and I think I called the order in and they tore it up, to the best

of my knowledge.'' But it does not appear at what time in August this order was given, or that it would have been possible to obey it before it was withdrawn by a sale at $65 per share. At this period the value of the stock was very fluctuating. The record shows that on the 5th of August, 1857, the appellees purchased for Price 150 shares, at $52 per share, and that the highest point it reached between the 25th of June and the 6th of October, 1857, was $67¼ per share. This is all we learn from the record on this subject, and it is impossible for us to infer fraud on the part of the appellees in not executing the order referred to.

These are all the questions in the case we deem important to be decided. Having thus considered and disposed of them, the result is that the decree appealed from must be affirmed.

*Decree affirmed.*

(Decided 8th April, 1874.)