Henry Presser, Respondent, *v.* Central Trust and Savings Company, Appellant.

Second Department, December 5, 1919.

Pledge — repledge — evidence showing pledgee was pledgor's agent in repledging — action for money had and received — equitable defense — estoppel — pledge of collateral with unconditional power of disposition — repledge to secure pledgee's own indebtedness — estoppel of owner of securities placed in hands of another to secure loan to deny authority.

In an action by an assignee it appeared that his assignor, for the purpose of securing funds to carry on its business, assigned all its accounts receivable to one D. who agreed to procure money thereon, under a written contract giving D. unlimited authority to sell, pledge or reassign said accounts; that D. reassigned said accounts to the defendant, that in the certificate of indebtedness given with each separate account assigned to D., the plaintiff's assignor made certain representations for the purpose of " inducing " institutions or persons to whom D. might reassign to make a loan; that the plaintiff's assignor repaid D., who did not turn the money over to the defendant, and that thereafter D. having failed the defendant received certain money on said assigned accounts, for the recovery of which this action was brought.

*Held*, on all the evidence, that D. was the agent of plaintiff's assignor, which, as a matter of law, was put upon notice that D. was a mere broker or " go-between," and was to reassign and repledge the collateral;

That the payment by the plaintiff's assignor to D. did not discharge its liability to the defendant, and that the latter was entitled to retain the security, until the debt thereby secured was paid;

That the action is in the nature of one for money had and received by defendant, and as such is to be determined on equitable principles.

The unconditional power of disposition having been intrusted by the plaintiff's assignor to D., the principle of estoppel applies in favor of the defendant which took the collateral in good faith, and for value, relying on the express representations of the borrower.

A pledgor can give his pledgee power to repledge or reassign collateral even to secure the pledgee's own indebtedness. Such power was conferred on D. and was exercised in defendant's favor.

When the owner of securities places them in the hands of another for the purpose of inducing financial institutions and persons to part with their money, such owner is estopped from denying the authority of the person so intrusted with the securities; the owner has acted either intentionally or with such negligence as to entitle the lender to relief upon the ground that he has been misled.

APPEAL by the defendant, Central Trust and Savings Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Kings on the 29th day of July, 1918, upon the report of a referee appointed to hear and determine the issues.

The plaintiff, as assignee of Geo. Brooks & Son Company (hereinafter called the Brooks Company), sues to recover from defendant the sum of $14,080.71, the amount received by defendant Central Trust and Savings Company (hereinafter called the Trust Company), as the proceeds of certain accounts receivable of the Brooks Company, assigned by that company to one Dockendorff as collateral for loans made, and by Dockendorff reassigned to the Trust Company, which latter company furnished the money loaned. Dockendorff had plenary powers from the Brooks Company to reassign or repledge the accounts receivable, and defendant contends that the Brooks Company knew of the transfer, and knew from the outset that Dockendorff intended to obtain the money loaned from financial institutions. On the other hand, the plaintiff, representing the Brooks Company (and he took the assignment with full knowledge of the facts), asserts that the loans were repaid to Dockendorff, that it had no knowledge that the money came from the Trust Company, or that the accounts receivable had been reassigned and that it was, therefore, justified in paying the money to Dockendorff. Dockendorff failed in July, 1914, but at the date of his failure the agreement between the Brooks Company and Dockendorff was in full force, and as matter of fact there was a balance due Dockendorff on the loan account. The referee found that between March 29, 1913, and July 6, 1914, the Trust Company made advances upon the security of the assigned accounts, which to the amount of $18,771.61 had not been repaid to it, except that after July 14, 1914 (the date of Dockendorff's failure), it received a total of $14,080.71 proceeds of accounts receivable which were a part of those originally assigned by the Brooks Company to Dockendorff and by him reassigned to the defendant. This sum of $14,080.71 was collected from the various parties owing the accounts, some of it by defendant and some by the Brooks Company, which turned the money over to defendant under an agreement

attached to the complaint, which recited the conflicting claims of the Brooks Company and the defendant, and provided that the money be turned over to the Trust Company subject to the determination of such claims. It is to recover this money that the action is brought. The referee found a balance due from the Brooks Company to Dockendorff on July 14, 1914, of $5,386.92, and gave a judgment against defendant for the amount received by defendant less $5,386.92, to wit, $8,693.79.

*Clifton P. Williamson* [*James McMullan* and *W. W. Lancaster* with him on the brief], for the appellant.

*Charles Capron Marsh* [*Frederick Hallock Stokes* with him on the brief], for the respondent.

KELLY, J.:

In 1913-1914 the Brooks Company was in need of money to carry on its business, and to my mind its needs were pressing, otherwise it would not have been obliged to resort to the method of raising funds disclosed in the case at bar. Apparently this method was recognized in business circles, and was adopted by other mercantile houses. The transaction seems to me to be a sort of pawnbrokerage, which evidences dire need on the part of the borrower, but it has been declared legal by the Supreme Court of the United States in *Greey v. Dockendorff* (231 U. S. 513, affg. 203 Fed. Rep. 475; 121 C. C. A. 597).

But the basic fact in the controversy is that the Brooks Company needed money. One John E. Dockendorff, who is described as a banker in New York city, but who was evidently a loan broker, had conceived and carried on a business of obtaining money for would-be borrowers. He maintained an office in Broad street, in the name of J. E. Dockendorff & Co., and had agents or solicitors going about to discover the needy ones, and provided the necessary machinery by means of elaborate contracts in writing between the would-be borrower and himself, and a similar contract between himself and the various financial institutions supplying the money. The borrower turned over to Dockendorff all of its accounts receivable by formal assignment and with grant to him of almost absolute power in the handling of the assigned accounts.

Dockendorff could accept them or reject them; he was given absolute power to deal with them as owner; he might assign them, and, as will be seen, it was in contemplation of the Brooks Company that they were to be assigned. The borrower gave a promissory note for $50,000 payable on demand to Dockendorff, and agreed that he could, if he saw fit, put a representative in its business while the arrangement continued. The accounts were assigned without information being given to the Brooks Company's debtors, so that its financial needs might not be made public. Dockendorff obtained the money from various financial institutions, including the defendant. He assigned and repledged the accounts receivable and, in the case at bar, the promissory note of the Brooks Company. The various customers and debtors of the Brooks Company, who knew nothing of these transactions, paid the accounts when due to the Brooks Company, and under the agreement the net amount received was at once turned over by the Brooks Company to Dockendorff. When the accounts were paid by check, the checks were turned over. If there were any rebates, allowances, discounts, goods returned or the like, or if the customers failed to pay their accounts, the Brooks Company was obligated to make good the deficiency between the face of the account assigned and the amount received.

Dockendorff deposited the money received by him from the Brooks Company in his own deposit account in the Empire Trust Company in New York city, and until shortly before his failure he regularly remitted to the defendant the proceeds so received from the Brooks Company, by checks on his Empire Trust Company account, accompanied by statements showing the accounts paid.

Dockendorff agreed to advance to the Brooks Company eighty per cent of the face value of the accounts assigned. He paid the money to the Brooks Company in flat amounts, $2,500 or $3,500 at a time, by his own checks. As between Dockendorff and the defendant Trust Company, upon the receipt of the assigned accounts, the latter company at once credited Dockendorff with seventy-five and two-tenths per cent of the face value thereof, placing the money in a checking account on the books, carried as " J. E. Dockendorff No. 3 (Geo. Brooks & Son Company)." When Dockendorff received

proceeds of collected accounts from the Brooks Company, he forwarded to defendant his personal check on the Empire Trust Company for the full face value of the accounts collected irrespective of the amount actually received by him from the Brooks Company, and the defendant then placed twenty-four and eight-tenths per cent of the face value of the account so received to the credit of the checking account on its books, " J. E. Dockendorff No. 3 (Geo. Brooks & Son Company)." Thus 100 per cent or the full face value of the account was placed by defendant to the credit of Dockendorff.

The defendant Trust Company knew of. Dockendorff's agreement with the Brooks Company, that agreement being annexed to the contract between Dockendorff and the Trust Company.

Dockendorff was procuring money for the Brooks Company from sources other than defendant. He had a similar arrangement with Ruffer & Sons, the London bankers, defendants in the companion case of *Presser* v. *Ruffer* (190 App. Div. 912), decided herewith.

When Dockendorff failed in July, 1914, it appeared that he had advanced to the Brooks Company in all, covering interest and commissions, $648,710.90 against payments made to him on the assigned accounts, aggregating $639,478.57. This left a balance due of $9,232.33. After the failure this balance was further reduced by remittances from customers of $3,845.41, leaving the final balance against the Brooks Company $5,396.92.

But Dockendorff had failed to remit to defendant as agreed, and at that time there was a balance due defendant upon the assigned accounts held by it of $18,920.09, and on these assigned accounts the sum of $14,080.71 has been collected and is in defendant's possession. This is the amount sued for in this action.

Of the accounts held by defendant as security for this $18,920.09, it appears that the Brooks Company had delivered to Dockendorff $7,415.08. specific proceeds of certain of the accounts, and had paid to him other moneys more than sufficient to discharge the. entire balance. But including interest charges and Dockendorff's commissions, there was still a balance due from the Brooks Company to Dockendorff of $5,386.92. The Brooks Company never obtained the return

of the assigned accounts or " certificates of indebtedness " as they were called, from Dockendorff. These papers with the Brooks Company's assignment to Dockendorff and Dockendorff's reassignment to the defendant and the promissory note were in defendant's possession at the time of the failure. There is evidence that on one occasion the Brooks Company's treasurer asked Dockendorff to return them when paid, but Dockendorff replied that " he never returned them and it would be a great deal of trouble to sort them out; after a time he would get them together and send them."

The complaint contains two causes of action and plaintiff advances three theories upon which he claims defendant is liable.

1. That the relation of debtor and creditor existed between the Brooks Company and Dockendorff, and between Dockendorff and the defendant, but not between the Brooks Company and defendant. And plaintiff contends that in such case payment by the debtor Brooks Company to its creditor Dockendorff, without notice that the accounts had been reassigned, is sufficient to discharge the debt and to release all accounts remaining uncollected. And he asserts that this is in accordance with the general principle that payment by the debtor to the assignor before notice of the assignment will be valid against the assignee (citing 5 C. J. 960).

2. That the defendant acting as an undisclosed principal (through Dockendorff dealing with the Brooks Company apparently as principal but actually as the defendant's secret agent) made the loans to the Brooks Company. Plaintiff contends that in such a case the Brooks Company was justified in repaying the loans to Dockendorff, known to it only as principal.

3. Plaintiff says, looking beyond the technical relations as created by the written agreements and the course of business between the parties, and assuming that the loans were, in ultimate effect, made by the defendant to the Brooks Company through Dockendorff, even though no privity of contract arose between original lender and ultimate borrower, nevertheless payment by the Brooks Company to Dockendorff is sufficient to discharge the debt and to release all accounts remaining uncollected, and he contends that this is in accordance with the general principle that payment of a debt to a third person is valid where the third person is expressly or

impliedly authorized by the creditor to receive payment, as where the payment is made to the third person by the request or with the consent of the creditor, or where the original agreement is to pay the third person (citing 30 Cyc. 1183).

The defendant, appellant, summarizes its contentions by stating: " Geo. Brooks & Son Company claims that the financial institutions are not entitled to retain the proceeds of accounts collected by them, except to the extent of the advances actually received by Geo. Brooks & Son Company which remain unpaid; that all such advances have been paid in the manner hereinbefore set out and, therefore, it is entitled to the return of the moneys collected by the financial institutions. Reduced to its simplest form, the question for determination, therefore, is: Whether the assignee, for value, of a book account, who has collected it, is entitled to retain the proceeds as against the assignor, the amount loaned upon the security of such book account never having been paid to the assignee." And appellant asserts that the defendant became the owner of the assigned accounts of Geo. Brooks & Son Company covered by the certificates of indebtedness now in defendant's possession, and of the proceeds thereof which it now holds, and that defendant's ownership of the certificates of indebtedness and the proceeds thereof has not been extinguished.

The plaintiff, respondent, contends that the issues raised by the pleadings and the evidence may be reduced to these two questions:

1. Did plaintiff's assignor ever borrow any money from the defendant?

2. Did Dockendorff receive the proceeds of the assigned accounts, as the agent of Geo. Brooks & Son Company, or as the agent of the defendant? And plaintiff argues: I. That the Geo. Brooks & Son Company paid to John E. Dockendorff proceeds of assigned accounts equal to the total of all sums advanced thereon to the Brooks Company, and that such payment released all accounts remaining uncollected. II. That the agreement between the Brooks Company and Dockendorff established the relation of debtor and creditor between them, and that all advances under that agreement were made by Dockendorff either individually or as the agent of the banks as undisclosed principals. III. That Dockendorff was

the agent of the defendant to receive all proceeds of assigned accounts. IV. That the Brooks Company was entitled to pay the demand note executed by it to Dockendorff by delivery to Dockendorff of sufficient proceeds of assigned accounts, and such payment released all accounts remaining uncollected. V. That the defendant has ratified the act of Dockendorff as its agent in receiving payment of the amount loaned by defendant.

I will not attempt to state here in detail the very learned arguments of the counsel on both sides, or to follow them in their discussion of the details of the transactions between the Brooks Company, Dockendorff and the Trust Company.

Upon the argument I was impressed with the fact that the inception of the controversy is found in the fact that in 1912 or 1913 the Brooks Company was in sore need of money, and that to obtain that money it sought Dockendorff and turned its affairs into Dockendorff's hands with most plenary and sweeping authority granted him, if he would obtain for them the cash to carry them through. I am not at all impressed with the respondent's contentions that Dockendorff was not their agent in the matter and that while the relation of debtor and creditor existed between the Brooks Company and Dockendorff no such liability existed to the defendant, and that the Brooks Company had no notice of the reassignment and repledge of the note and the assigned accounts.

I think these claims are negatived by the uncontradicted essential facts, if we seek them through the maze of the Dockendorff machinery and contracts. I think it is very plain that Dockendorff was acting as a loan broker, and that the cloud of secrecy with which it is attempted to hide the real facts was created by the desire of the Brooks Company to conceal its financial distress from its customers, disclosure of which would obviously injure it in its business transactions. Otherwise it might as well deal directly with the banks. But that the Brooks Company and its manager, Mr. Morrell, actually knew, and as matter of law were put upon notice that Dockendorff was simply a broker, or " go-between," and was to reassign and repledge the collateral with the banks, is established beyond question by the evidence.

I remark in passing that in the companion case of *Presser*

v. *Ruffer* (190 App. Div. 912), decided herewith, Mr. Morrell actually met the representative of Ruffer in Dockendorff's office and made statements as to the financial responsibility of the Brooks Company, and personally went to the mercantile agencies to secure more favorable reports on the financial condition of his company, before Ruffer consented to advance the money. And in spite of all this, Morrell on the witness stand, in what appears to me to be an obvious attempt to avoid the result, denies knowledge of the source of the money received. He does this in Ruffer's case. He does it in the case at bar. And the learned referee finds as matter of fact that the Brooks Company " never knew or had reasonable cause to know that John E. Dockendorff had ever assigned to the defendant any account receivable which Geo. Brooks & Son Company had assigned to him or had ever assigned or transferred to the defendant any promissory note made by the defendant or had ever procured any loan from the defendant upon the security of any such account or note." With all due respect to the learned referee, I think this finding is absolutely contrary to the evidence in the case.

On July 10, 1914, the books of the Brooks Company and Dockendorff showed advances made to the former between August 19, 1912, and July 10, 1914, on the security of assigned certificates of indebtedness of $635,000, which with interest and Dockendorff's " commissions " aggregated $648,-710.90. Of this aggregate the defendant Trust Company had furnished $311,505. And to obtain this very substantial sum, the Brooks Company through Mr. Morrell had assigned all of the accounts receivable of that company to Dockendorff, each account in the form of a " certificate of indebtedness." The Brooks Company had agreed in paragraph IV of their contract with Dockendorff as follows: " IV. It is mutually agreed that the party of the second part shall have full power to reassign the accounts receivable; and that said accounts receivable shall be and remain the sole property of the party of the second part, or his assigns, with unlimited authority to sell, assign, pledge, repledge, collect, compromise, extend or convert into bills receivable with or without security; and the party of the second part and his assigns, either jointly or severally, may institute and prosecute legal proceedings

for the collection of the same, or do anything else in connection therewith which the borrower might do had such account receivable not been assigned, and this without extending the time of payment of any loan. The borrower agrees to repay to the party of the second part the expense incurred by him, including counsel fees, in any proceedings instituted or prosecuted by or against him or his assigns, or otherwise, in the collection of the loan or of the accounts receivable, or for the protection or preservation of his or their rights in the premises." And upon each "certificate of indebtedness" was indorsed (italics mine): "The undersigned, *knowing that this account is to be reassigned by John E. Dockendorff to a financial institution or person* and is to be given to said financial institution or person *as collateral security for a loan to be made to the undersigned,* for the express purpose of inducing said institution or person to which it may be assigned by John E. Dockendorff to part with its money *and to make the said loan to the undersigned,* does hereby make the following *representations to both John E. Dockendorff and the said financial institution or person.*" And this identical statement was indorsed on *each* of the certificates of indebtedness, on each of the assigned accounts, in amounts from $2.75 up. It was not a single transaction. Morrell says he signed the statement "thousands of times." Each certificate assigned during the period of nearly two years bore the identical "representation" signed by Morrell, and paragraph 5 of the same representation read (italics mine): "5. That, if any checks or money due on the account hereby assigned shall at any time come to the undersigned, such checks or money shall be accepted by the undersigned *as the property of the institution or person lending the money hereon, and be immediately transferred to John E. Dockendorff.*"

I cannot imagine a more clearly, unmistakable "representation" made to induce the financial institution to "part with its money." If any checks or money due from the customers of the Brooks Company whose accounts were assigned should be paid to the Brooks Company, that corporation through Mr. Morrell covenants that it will be accepted "as the property of the institution or person lending the money hereon." The Brooks Company certifies that "knowing that this account is

to be reassigned " it makes certain representations to induce the. loan to it, the Brooks Company. This is exactly what happened, the account was assigned, as the Brooks Company knew it would be, and the financial institution, the defendant, parted with its money on the face of this declaration. It is inconceivable that Mr. Morrell and the Brooks Company were ignorant of the method of business pursued by Dockendorff as matter of fact, but in my opinion they will not be heard to assert such ignorance as matter of law.

The money in the possession of the defendant and to obtain which this action is brought is, to paraphrase paragraph 5 of Mr. Morrell's " representation " and agreement, checks or money due on the accounts assigned and now in possession of the defendant which came to the Brooks Company, and in the possession of that company it was the property of the defendant which had loaned money thereon on the strength of the certificate and the representation indorsed thereon. The Brooks Company had agreed that the money or checks received by it on such accounts should be immediately transferred to Dockendorff. For what purpose? Surely to pay it to the institution which had loaned money on the account and which held the certificates and the representation as collateral for the loan. The identical fund sued for is money turned over to defendant after Dockendorff's failure, by the Brooks Company, received by that company from customers, or collected by the defendant from customers whose certificates it held.

I am free to say that I see no answer to this. The record is voluminous and the points are elaborate and somewhat involved. Dockendorff's merits and demerits and the intricacies of the bookkeeping methods are discussed at great length, but in the end it seems to me to be a simple proposition.

And I think this conclusion is supported by the authorities. The action is in the nature of an action for money had and received by defendant, and as such it is to be determined upon equitable principles. " Whether the action were debt or assumpsit, the plaintiff's case depended upon the question to which party, plaintiff or defendant, does the money *ex æquo et bono* belong? If to the plaintiff, it was because the facts created an indebtedness to him from defendant. In this respect the action has been frequently stated to be an

' equitable one,' that is one depending upon general principles of equity for the maintenance of the plaintiff's claim to the money. (*Kingston Bank* v. *Eltinge*, 66 N. Y. 625; 2 Wait Law & Prac. [5th ed.] 391.) It is the most favorable way in which a defendant can be sued; he can be liable no further than the money he has received, and against that he may go into every equitable defense upon the general issue; he may claim every equitable allowance, etc., in short he may defend himself by everything which shows that the plaintiff *ex æquo et bono* is not entitled to the whole of his demand or any part of it." (*Chapman* v. *Forbes*, 123 N. Y. 532.) In the case at bar the provisions of the contract between the Brooks Company and Dockendorff and of the assignment of the certificates of indebtedness give to Dockendorff ample authority to reassign and repledge the promissory note and accounts receivable. Such reassignment and repledging of the accounts and of the note were not only contemplated, but the Brooks Company, by its declaration on the papers, knew that they were to be reassigned for the very purpose of procuring the loan. In such case I think the Trust Company as the pledgee was entitled to retain the security until the debt thereby secured was paid. The unconditional power of disposition having been intrusted by the Brooks Company to Dockendorff, the principle of estoppel applies in favor of the Trust Company which took the collateral in good faith and for value, relying on the express representations of the borrower. This is entirely aside from the question whether the relation of debtor and creditor existed between the Brooks Company and the defendant. I think on the facts here such relation did exist, but that determination is not necessary to sustain the conclusion reached. The relation between the Brooks Company, Dockendorff and the defendant in these loan transactions was before the Circuit Court of Appeals in the Sixth Circuit in *International Banking Corp.* v. *McGraw Tire & Rubber Co.* and *Robert Morris Trust Co.* v. *McGraw Tire & Rubber Co.* (259 Fed. Rep. 381). In those cases the complainants, occupying a similar position to the defendants here, filed their bills to enforce the trust which they alleged was created in their favor by virtue of the 5th clause in the representations indorsed upon the certificates of deposit above

set forth. At the date of Dockendorff's failure there was due and owing to the banks in those cases the sum of $105,000 and interest, for which they held these certificates. After April 1, 1914, the various debtors of the borrower, the McGraw Company in those cases, whose accounts had been reassigned to the banks, paid their indebtedness to the McGraw Company. The banks demanded payment of the money to them. The McGraw Company answered that it had paid its indebtedness in full to Dockendorff prior to the maturity of the accounts receivable. The bills were dismissed in the Circuit Court, but upon appeal the judgments were reversed. Circuit Judge Denison, writing for the court, said: " We think the vital question is that of notice. It is not to be disputed that a debtor, who has pledged with his creditor any non-negotiable security, whether tangible property or choses in action, and who is not chargeable with notice that the creditor has rightfully parted with the security so pledged, may pay his debt to his creditor and thereby become entitled to the return of his security, and that, under those conditions, the risk is carried by the second transferee of the property who has not given notice of his rights. It must be equally clear that, where the creditor, who had received this pledge, has a right himself to repledge or retransfer the property for his own benefit, and where the principal debtor is chargeable with notice that such retransfer has been made, if he pays his debt without obtaining the return of the property pledged, he does so at the risk of being compelled to satisfy the claim of the second transferee in order to get his property back. In order to determine the question of Dockendorf's right to transfer these accounts over to the banks and the question of notice to the defendant on or before April 10, that such transfer had been made, it is only necessary to refer to the contract provisions above quoted, and especially to clause 5 and the provision quoted just before that clause. It is not easy to conceive a more express and complete admission by defendant of notice of the assignments in question. It seems clear to us that, in the face of this contract, the defendant cannot be heard to say that it is not chargeable with notice that Dockendorf had made that very reassignment for the purpose of making which it had made the assignment to him." And the

court further said: " It is said that these transfers by Dockendorf to the banks were to secure loans to Dockendorf, and hence were not within the scope of the notice to be inferred. We cannot think this a substantial distinction. The loans in question were, in ultimate effect, made by the banks to the defendant through Dockendorf, even though no privity of contract arose between original lender and ultimate borrower. The precise expected form of doing business had been departed from, but the substance was the same, at least as to the reasonable inferences regarding notice. The issue is not whether knowledge or express notice by (*sic*) the defendant is established; the issue is whether, under all the facts and circumstances, there was enough to put the defendant on notice that the accounts had been transferred; and we are satisfied that there was enough." And the court in the cases cited referred to the claim made in those cases that the defendants were justified in disregarding the notice that the accounts had been transferred because of the course of business, and that they might treat the accounts as the property of Dockendorf and discharge their obligation by payments to him, and said: " We find nothing in this course of business justifying any belief that Dockendorf was not assigning over the accounts ' to some person or financial institution,' as the agreement contemplated he should do. Even if it may have been the custom for defendant to pay Dockendorf round sums from time to time, without reference to specific accounts, or yet to remit the full amount of accounts collected, this would not interfere with charging against defendant that notice which is here the vital thing. The contract expressly provided that, in spite of the transfer over by Dockendorf of an account, the amount thereof, when it was paid, should be remitted by the defendant to Dockendorf; and the fact that business was done pursuant to this arrangement or somewhat variant therefrom cannot avail to escape the effect of a notice declared by the contract * * *. The account assigned to the banks was a chose in action; it was property, and it stood as a valuable security. The moment the account was paid by the debtor to the defendant, the property or security which had been assigned to the bank disappeared from existence. There was nothing for the bank to assign back either to

Dockendorf or to the defendant. The claim of the bank attached, instead, to the proceeds. These were the property of the bank, in the hands of defendant or of Dockendorf. With regard thereto, the banks had the rights of ownership, whatever complications might develop. Wherever the trust fund could be followed, it could be recovered."

The plaintiff, respondent, in the case at bar attempts to distinguish the *McGraw* cases from the present controversy. He calls attention to the fact that in those cases the borrower, McGraw Company, attempted to terminate the existing contract between it and Dockendorff, by paying him the full balance due for advances in a lump sum — one check for $207,000 representing, not the proceeds of assigned accounts, but the net unpaid amount of the money received, before the maturity of the accounts receivable. Respondent says that the McGraw Company paid Dockendorff for a reassignment of the account when it had notice that the accounts were no longer in his hands. There was some evidence — very slight — in the *McGraw* case that defendant had been advised by some extrinsic evidence that Dockendorff " might have assigned " the accounts. I am free to say that I cannot see how the respondent answers the reasoning of the Circuit Court of Appeals, which was based entirely upon the language of the contracts and of the representations in the indorsement and assignment of the certificates of indebtedness which are precisely similar to those in the case at bar.

The general propositions of law asserted by the defendant, and which I think are applicable to the facts here, are:

1. That a pledgor (in this case the Brooks Company) can give his pledgee power to repledge or reassign collateral even to secure the pledgee's own indebtedness, and that such power was conferred in this instance and has been exercised in defendant's favor. (*Matthews* v. *Warner*, 145 U. S. 475; *Matter of H. B. Hollins & Co.*, 232 Fed. Rep. 124 [C. C. A. 2d Circuit]; *Skiff* v. *Stoddard*, 63 Conn. 198, 219; *Price* v. *Gover*, 40 Md. 102, 116; *Wilson* v. *Hawley*, 158 Mass. 250; *Ogden* v. *Lathrop*, 65 N. Y. 158; *United National Bank* v. *Tappan*, 33 R. I. 1.) Appellant also cites Dos Passos on Stockbrokers (Vol. 1 [2d ed.], 281). The Circuit Court of Appeals in the *McGraw Case* (*supra*) referred to cases of

rehypothecation of collateral by stockbrokers, but said that it did not seem necessary to consider or decide the claim of the banks to relief upon the analogy of the rule in stock-broker cases.

2. When the owner of securities (in this case the Brooks Company owning the assigned accounts) places these instruments in the hands of another (in this case Dockendorff) for the purpose of inducing financial institutions and persons to part with their money, such owner is estopped from denying the authority of the person so intrusted with the securities. The owner has acted either intentionally or with such negligence as to entitle the lender to relief upon the ground that it has been misled. (*Cowdrey* v. *Vandenburgh*, 101 U. S. 572; *Baker* v. *Wood*, 157 id. 212; *McNeil* v. *Tenth National Bank*, 46 N. Y. 325; *Moore* v. *Metropolitan National Bank*, 55 id. 41.)

The respondent says that none of these cases apply because the facts were not analogous to those in the case at bar. But the principles declared in the cases cited apply to the transactions involved in this litigation. Applying the equitable principles which should govern the court in determining the rights of the parties to the fund in dispute, the court brushes aside the mere camouflage and seeks the real *status* of the litigants. And from this point of view I think the equities are all with the defendant, appellant.

The judgment should be reversed, with costs, upon the facts and the law, and judgment directed in favor of the defendant, with costs, establishing its right to retain the proceeds of the assigned accounts now in its possession, as security for any balance due to it for advances made upon the credit of the accounts assigned. The findings of fact and conclusions of law made by the learned referee inconsistent with the views herein expressed should be reversed and new findings and conclusions made by this court in conformity with this opinion.

Jenks, P. J., Mills, Putnam and Jaycox, JJ., concurred.

Judgment reversed, with costs, upon the facts and the law, and judgment unanimously directed in favor of defendant, with costs, in accordance with opinion. Order to be settled upon notice before Mr. Justice Kelly.